WAL–MART STORES, INC. and
Terri Hansen, Appellants,

v.

Russell E. BERTRAND, Appellee.

No. 12–99–00156–CV.

Court of Appeals of Texas,
Tyler.

May 31, 2000.

Rehearing Overruled Aug. 3, 2000.

Ranae Bartlett, Bentonville, Chris Bunt, Tyler, for appellant.

M. Keith Dollahite, Tyler, for appellee.

Panel consisted of RAMEY, Jr., C.J., HADDEN, J., and WORTHEN, J.

JIM WORTHEN, Justice.

Russell E. Bertrand ("Bertrand") filed suit against Wal–Mart Stores, Inc. ("Wal–Mart") and Terri Hansen ("Hansen")[1] for constructive discharge from his position at Wal–Mart on the basis of age, intentional infliction of emotional distress and malicious or reckless conduct. After a jury trial, the court awarded Bertrand judgment against Wal–Mart in the amount of $1,192,005.22, and against Hansen in the amount of $67,588.77. Appellants raise six points of error.[2] We will sustain Appellants' first two points of error and reverse and render judgment that Bertrand take nothing.

**BACKGROUND**

Wal–Mart first hired Bertrand at age forty-one to be an operations manager in its United States distribution system. After his initial training, Bertrand worked as an operations manager in Wal–Mart's Brookhaven, Mississippi distribution center. He then transferred to another Wal–Mart distribution center in Cullman, Alabama, where he spent about a year. In May of 1994, Bertrand transferred to a soft-lines distribution center in Palestine, Texas, where he worked under the general manager, Michael Shaddix.[3] Bertrand testified he liked working under Shaddix, considered him a friend, and even interacted with him and his wife on a social basis. Bertrand received a raise and what he termed an "acceptable" evaluation from Shaddix in November of 1994. Under Shaddix, Bertrand had started out working the first shift at the soft-lines distribution center, which normally went from 8:00 a.m. to 5:00 p.m. However, after purchasing land and horses in Anderson County, Bertrand approached Shaddix about transferring to the center's second shift, where he would work from mid-afternoon until after 11:00 p.m. when it officially ended. Shaddix approved Bertrand's transfer to the second shift.

In February 1995, Shaddix was transferred to New York by Wal–Mart. He was replaced as general manager at the soft-lines distribution center in Palestine by Terri Hansen, who had been at a Wal–Mart distribution center in Georgia. Hansen had begun working for Wal–Mart as an hourly associate in 1987 and rapidly moved up the corporate ladder to become

1. Wal-Mart and Hansen are sometimes collectively referred to hereinafter as "Appellants."

2. In their first three issues, Appellants challenge the legal and factual sufficiency of the evidence to support the trial court's judgment that Bertrand was constructively discharged because of age, that Appellants intentionally inflicted emotional distress upon Bertrand, and that punitive damages should be awarded against Appellants. In three other issues, Appellants contend that Bertrand failed to mitigate his damages, and that the trial court erred in awarding front pay and awarding attorney's fees based on a contingency fee agreement.

3. Wal–Mart had two distribution centers in Palestine. One was a soft-lines distribution center where Shaddix and Bertrand worked. The other was a standard regional distribution center which had three times more employees.

a distribution center general manager by the time she became Bertrand's superior in Palestine. It is uncontroverted that Hansen asked Bertrand if he was ready to transfer only a week after taking up the reins of the soft-lines distribution center. Bertrand responded to her that he wanted to make Palestine his permanent home. He explained that his daughter, who was in the fourth grade, had never stayed in one school for more than a year since he joined Wal–Mart and that his family was ready to settle down.

The testimony at trial was overwhelming that Hansen had a different management style than Shaddix. Pam Davis, who was the personnel manager at the soft-lines distribution center and who was on the same management level as Bertrand, testified that she did not believe that Hansen had "a lot of people skills" and that she did not "show that she ha[d] any confidence in any of her managers." She further stated that Hansen informed the operations managers at the soft-lines distribution centers in one of her first meetings with them that "I am going to tell you right now that if any associate comes to me, I am going to believe them. So, don't even prepare a defense." Bertrand testified that Hansen's management style was "harsh." He said that her style "made you question everything you did. You never knew when you did anything right. And most of the time you only knew when you did something wrong is when she was almost beating you about the head and shoulders with it." Davis said that once she and the managers were trying to explain a policy to Hansen which had been implemented under Shaddix, and which they felt was very effective. She said that in response to this, Hansen slammed her hand on the table and said "I don't want to ever hear his name mentioned here. He doesn't work here anymore. I do, and I'll make the decisions." This testimony, along with that of another operations manager, Rodney Huddleston, established that the middle managers working under Hansen were very unsettled by her style and approach

toward them. Davis further testified that there was no difference between how Hansen treated the middle managers over forty and how she treated those under forty. She indicated that she thought Hansen was mean to Bertrand, but said she was also mean to Kevin Harris, an operations manager in his middle thirties.

On June 5, less than four months after assuming the job of general manager, Hansen met with Bertrand to review his job performance and made these notes of their meeting, which were part of the evidence at trial:

Terri Hansen GM 6005

Palestine, Tx.

Subject: Russ Bertrand

June 5 th, 1995

At this time we are meeting to discuss the overall performance of the evening shift operation and the opportunities that exist with leadership of Russ Bertrand.

Follow up- Russ has a lack of follow up in the overall operations area.

MR air conditioner- froze up, replace 20 ceiling tiles

TPR-addressed numerous times with coaches

TPR–Handwritten check

Old trailers on yard

Two trailers not shipped on holiday week-end

Development and Training of staff and associates

Meetings- balancing workload, specific direction communicating the plan,

consistency with other shifts

Technical Knowledge-

Details necessary to identify trigger points—no coachings

Direction/Communication-

Breakdown with communications exist

Changes to meeting times- Work days for holiday

Always be at start up meetings.

Told to review at least 3 times a week with GM.

Involvement-

Never here

Never available

Not involved

Associates drinking on parking lot lunch hour shift change

Trigger points

Old PO's on dock—5–25–95 6–5–95

5–22–95 Missing FRT

Good judgement-

Operation as a whole struggling-

. . .

This meeting resulted in Hansen giving Bertrand a first step of discipline. Wal–Mart had three steps in its disciplinary system before an employee could be terminated, unless moral turpitude were involved. This first step, as described by Hansen at trial, was to tell the employee "You are not doing your job." With regard to the drinking of alcohol problem mentioned by Hansen, she informed Bertrand he needed to forego his "lunch hour" until he got control of the situation. Bertrand testified he told Hansen this would cause him to miss his ten-year-old daughter's midweek softball games. Bertrand stated that Hansen replied, "I could not go to my daughter's games."

At a later meeting, Hansen mentioned to Bertrand that he might be a good personnel manager because of his people skills and that he might want to consider transferring to another distribution center for a position in personnel. Shortly after this comment, the current personnel manager working under Hansen, Pam Davis, tendered her resignation. Bertrand applied for the open personnel manager's job along with three other Wal–Mart managers. Bertrand conceded at trial the personnel manager's position would be a lateral move from second shift operations' manager for him as it would not result in an increase in pay or benefits. The position, however, was filled by John Jacobs,

the employment coordinator at the other Wal–Mart distribution center in Palestine. Jacobs had been responsible for hiring more than 1,100 associates at the Wal–Mart regional distribution center in Palestine. Further, he had scored 100% on his personnel procedures test and had been recommended for promotion to personnel manager prior to Davis's resignation. Bertrand testified that he had never worked in personnel for Wal–Mart. Further, he had not been directly involved in personnel for over fifteen years.

Following Jacobs's promotion to personnel manager under Hansen, Bertrand tendered the following resignation letter to Hansen:

Send to: TERRI HANSEN
RUSS BERTRAND
SECOND SHIFT OPS. DC–6005
PALESTINE, TEXAS 903–723–4412
Subject: RESIGNATION FROM WAL*MART
IT IS AFTER CAREFULL[sic] CONSIDERATION, I FEEL I AM COMPELLED TO SUBMITT[sic] MY RESIGNATION FROM WAL*MART. AFTER OUR CONVERSATION ON MONDAY AFTERNOON, I FEEL YOU HAVE LEFT ME WITH NO CHOICE BUT TO RESIGN. I CANNOT BEGIN TO TELL YOU HOW COMPLETELY HUMILIATED AND DEFEATED I FEEL. IT WAS NOT EASY TO LISTEN TO YOU SAY I CANNOT BE CONSIDERED FOR THE POSITION OF PERSONNEL MGR. UNTIL I PROVE I CAN BE AN OPERATIONS MGR., AND LISTEN AS YOU TRIED TO DETAIL PROBLEMS I HAVE HAD HERE SINCE WE OPENED. ESPECIALLY SINCE MY EVALS HAVE NOT SHOWN THIS TO BE SO. AND THEN FOR YOU TO SAY MY COACHES AND ASSOC. FELT I WAS BOZO THE CLOWN AND HAD NO RESPECT FOR ME WAS THE LAST STRAW. I FELT YOU WERE ONLY TRYING TO INTIMIDATE

ME TO REACT IN AN UNAPPRO-PRIATE WAY, IN THE SAME FASHION THAT YOU DID RODNEY HUDDLESTON A FEW WEEKS AGO IN MY PRESENTS[sic].

WAL*MART IS A GREAT COMPANY AND I KNOW IT WILL CONTINUE TO BE ONE IN THE FUTURE. IT IS WITH REGRET THAT I LEAVE. PLEASE CONSIDER THIS AS MY TWO WEEKS NOTICE. I FULLY UNDERSTAND IF YOU WISH TO PAY ME IN LIEU OF WORKING THE NEXT TWO WEEKS AND YOU CAN CALL ME TO LET ME KNOW IF YOU WANT ME TO COME IN TOMORROW.

SINCERELY,

RUSS BERTRAND

CC: MIKE DUKE

    JIMMY WRIGHT

Approximately eleven months later, on June 16, 1996, Bertrand filed suit against Wal–Mart alleging he had been constructively discharged due to his age and sought punitive damages for malicious or reckless conduct. He further sued Wal-mart and Hansen, individually, alleging intentional infliction of emotional distress. The case was tried before a jury. At the close of Bertrand's case-in-chief and after both sides had rested, Wal–Mart and Hansen moved for a directed verdict, arguing that Bertrand had failed to introduce evidence to establish his intentional infliction of emotional distress claim and that there was no evidence to support his theory of constructive discharge. After denying Wal–Mart and Hansen's motion, the trial court submitted the case to the jury with standard definitions as to "proximate cause" and "ordinary care." A further general instruction given by the trial court stated "You are hereby instructed that discrimination because of age, or on the basis of age, applies only to discrimination against an individual forty years of age or older." The court's instructions were followed by a series of question, the first two of which stated:

QUESTION NO. 1

Was Russell Bertrand constructively discharged by Wal–Mart Stores, Inc.?

You are hereby instructed that by "constructive discharge" it is meant that an employee is considered to have been discharged when an employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign.

Answer "Yes" or "No"

Answer: *Yes*

If you have answered "Yes" to Question No. 1, then answer Question No. 2. Otherwise, to[sic] not answer Question No. 2.

QUESTION NO. 2

Was Wal–Mart's decision, if any, to constructively discharge Russell Bertrand because of his age?

Answer "Yes" or "No."

Answer: *Yes*

The trial court thereafter entered a judgment for Bertrand against Wal–Mart for back pay and prejudgment interest in the amount of $172,341.39, mental anguish and interest in the amount of $60,088.97, punitive damages in the amount of $250,000.00, front pay in the amount of $513,603.86, and attorney's fees for the trial in the amount of $195,971.00. Further, Bertrand was awarded $60,088.77 for mental anguish and prejudgment interest and $7,500.00 for punitive damages against Hansen individually. Wal–Mart and Hansen thereafter perfected this appeal.

### SUFFICIENCY OF THE EVIDENCE ON CONSTRUCTIVE DISCHARGE

In their first issue, Wal–Mart and Hansen allege there was no evidence, or in the alternative, insufficient evidence, to support Bertrand's claim that he was constructively discharged from Wal–Mart because he was forty-seven years of age. We will first address the legal sufficiency challenge. We review a challenge to the

legal sufficiency of the evidence by considering only the evidence and inferences tending to support the jury's finding, disregarding all contrary evidence and inferences. *Continental Coffee Products Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). If the plaintiff presents only a scintilla of evidence on a required element of a cause of action, then the no-evidence point must be sustained. *See Continental Coffee Products Co.,* 937 S.W.2d at 450.

Bertrand brought this age discrimination claim under the Texas Anti–Discrimination Statute. TEX. LAB.CODE ANN. § 21.051, et seq. (Vernon 1996) This State statute is intended to carry out the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments and "secure for persons in this state . . . freedom from discrimination in certain employment transactions. . . ." TEX. LAB.CODE ANN. § 21.001(1) and (4) (Vernon 1996). In employment discrimination cases, we may look to federal decisional law for guidance. *Specialty Retailers, Inc. v. DeMoranville,* 933 S.W.2d 490, 492 (Tex.1996); *Mackey v. U.P. Enterprises, Inc.,* 935 S.W.2d 446, 455 (Tex.App.—Tyler 1996, no writ). Both the federal and state anti-discrimination statutes prohibit an employer from intentionally discriminating against an employee with respect to the material terms of employment on the basis of age. 29 U.S.C. § 623(a) (1999); TEX. LAB.CODE ANN. § 21.051 (Vernon 1996).

When an age discrimination case based on Title VII is fully tried on its merits, the appropriate inquiry for the court is whether the defendant has discriminated unlawfully against the plaintiff. *See Barnes v. Yellow Freight Systems, Inc.,* 778 F.2d 1096, 1100 (5th Cir.1985). In the majority of reported cases involving age discrimination, the employer has terminated the complaining employee by firing him. When, however, an employee resigns as Bertrand did, he may satisfy the discharge element of an age discrimination case by proving constructive discharge. *See Barrow v. New Orleans S.S. Ass'n,* 10 F.3d 292, 297 (5th Cir.1994). A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *Hammond v. Katy I.S.D.,* 821 S.W.2d 174, 177 (Tex.App.—Houston [14th Dist.] 1991, no writ), *citing Shawgo v. Spradlin,* 701 F.2d 470, 481 (5th Cir.1983), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983).

Bertrand contends he presented overwhelming evidence that he was constructively discharged because of his age. He argues that part of this evidence was that he was asked by Hansen on two different occasions if he was ready or wanted to transfer to another Wal–Mart distribution center. In a constructive discharge context, an employer's actions must have been taken with the intention of forcing the employee to quit. *Smith v. Goodyear Tire & Rubber Co.,* 895 F.2d 467, 472 (8th Cir.1990). Here, there was no evidence that by asking him if he was ready or would like to transfer to another distribution center that Hansen was trying to force Bertrand to quit his job because of his age. Bertrand, however, stated that he had decided to establish his permanent home in Palestine, and thus a transfer was not desirable. He, nevertheless, admitted that when he had been hired by Wal–Mart in 1990, it was explained to him that he might have to transfer to other distribution centers around the country during his career with the company. This was particularly so if he wanted a promotion or another position with Wal–Mart. The Palestine soft goods distribution center had been Bertrand's third posting in his five years with Wal–Mart. A constructive discharge because of age cannot be based on an employee's subjective preference for one position or geographical location over another. *See Epps v. NCNB Texas,* 7 F.3d 44, 46 (5th Cir.1993).

Bertrand further alleges that the unfavorable work evaluations and the disciplinary step taken by Hansen show that he was constructively discharged because of his age. On June 5, 1995, Hansen met with Bertrand to discuss the performance of the evening shift which Bertrand directed. Hansen told Bertrand that his lack of involvement and follow-up was not meeting the needs of the second shift and was unacceptable. Further, she told him that he needed to provide the support necessary to insure the staff and associates' needs were being met. Bertrand, however, complained that Hansen criticized the job he was doing without telling him how to perform it better. Further, he suggested that the fact that Hansen told him his management ideas were outmoded or outdated was another indicia of constructive discharge.

"Step one," which Hansen took against Bertrand, was the first of three steps in the Wal–Mart disciplinary process. It is designed to let a subordinate know that a supervisor did not believe the subordinate was doing his job. All three steps, however, must be taken before an employee can face termination. An unfavorable work evaluation does not support a constructive discharge claim. *Junior v. Texaco, Inc.,* 688 F.2d 377, 380 (5th Cir. 1982). Without the freedom to criticize performance, an organization simply cannot function. *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 282 (4th Cir.2000), *citing Johnson v. Merrell Dow Pharms., Inc.,* 965 F.2d 31, 34 (5th Cir.1992) ("In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees.") Although Bertrand may have viewed Hansen's criticisms as unjustified, courts are not authorized to use employment discrimination law as a vehicle for substituting their judgment for that of an employer. *Hawkins,* 203 F.3d at 282. Thus, we conclude that Hansen's imposition of step one was not evidence of constructive discharge.

Bertrand also asserts that Hansen's refusal to allow him to attend his daughter's midweek softball games for a month was justification for a reasonable employee to find his work conditions so intolerable that he had no choice but to quit his job. Bertrand testified at trial that when Hansen told him he could not attend his daughter's midweek softball games that he had begun "the deepest slide I ever had individually and internally." He also described it as "the horriblest day of [his] life." The record indicates there was a problem with two employees working the second shift drinking alcohol on the premises. This violation of Wal–Mart's policy came to Hansen's attention. She informed Bertrand that it was his responsibility to get a handle on the alcohol problem that existed during his shift. Bertrand testified that it was at this time that Hansen told him he could not attend his daughter's midweek softball games during his lunch hour. While Hansen's directive may have upset Bertrand, it is clear from the record that this was merely Hansen's endeavor to properly manage the distribution center for which she had the ultimate responsibility to Wal–Mart officials in Bentonville. *See Johnson,* 965 F.2d at 34. As we have previously noted, employment discrimination law is not to be used as a vehicle for substituting a court's judgment for that of an employer in a matter of company policy and safety. *See Hawkins,* 203 F.3d at 282.

Bertrand next contends he was forced to resign because Hansen had "insulted and embarrassed" him in front of fellow employees by telling him that she and others in the distribution center thought that he was "Bozo the Clown." Bertrand testified that Hansen told her during one of their meetings that associates had referred to him as "Bozo the Clown" and that she concurred with that description. Derogatory comments resulting from disciplinary proceedings do not constitute constructive discharge even

when publicized. *Jett v. Dallas I.S.D.*, 798 F.2d 748, 755 (5th Cir.1986) *affirmed in part and remanded in part* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Shawgo v. Spradlin*, 701 F.2d at 481–82.

Bertrand contends that Hansen made three remarks which prove she was discriminating against him because of his age. The first of these involved a question asked by Hansen soon after her arrival when she met Lena Henry, a seventy-year-old hourly employee at the distribution center, "Who hired a seventy-year-old woman in this facility?" Wal-Mart contends this statement had no connection to Bertrand and his age. We agree. There is no evidence that this remark was related in any way to Bertrand's employment. Remarks made by a defendant may be sufficient evidence of discrimination if the comments are "(1) related [to the protected class of persons of which the plaintiff is a member]; (2) proximate in time to determinations; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue." *Krystek v. University of S. Mississippi*, 164 F.3d 251, 256 (5th Cir.1999) *citing Brown v.C.S.C. Logic, Inc.* 82 F.3d 651, 655 (5th Cir.1996). "The 'stray remark'" about Henry was no evidence of age discrimination toward Bertrand. *See Waggoner v. City of Garland*, 987 F.2d 1160, 1166–67 (5th Cir.1993) ("[M]ere stray remarks, with nothing more, are insufficient to establish a claim of age discrimination . . .").

The next statement Bertrand asserts constituted evidence of constructive discharge is one Hansen made while encouraging him to consider becoming a personnel manager at another Wal-Mart distribution center. He says that Hansen told him that he was like an "old trusted uncle" people felt they could talk to. Wal-Mart contends this was a stray remark that was actually part of a compliment to Bertrand, showing why he might make a good personnel manager. This stray remark did not indicate any age discrimina-

tion by Hansen toward Bertrand but rather focused on a positive perception of him by other Wal-Mart employees and is insufficient to establish age discrimination. *Id.; see Sreeram v. Louisiana St. Univ. Med. Ctr.*, 188 F.3d 314, 320 (5th Cir.1999).

The third remark Bertrand attributes to Hansen as evidence of constructive discharge was that Bertrand was "over the hill." This came into evidence during Bertrand's direct testimony in the following manner:

Q: Did she ever refer to you as being over the hill?

A: Over the hill. Yes.

The record, however, is devoid of any evidence pertaining to the context in which Hansen is alleged to have made this remark. By failing to put this remark into a relevant employment context, Bertrand has failed to show that this stray remark is evidence of any age discrimination. *See id.*

Bertrand next contends that the fact he was not given the job of personnel manager of the distribution center by Wal-Mart is evidence that he was constructively discharged because of his age. Bertrand admitted at trial that the move from operations manager to personnel manager at the distribution center would only have been a lateral transfer for him. Wal-Mart counters that an integral element of an age discrimination case is that an adverse or ultimate employment decision was made that affected Bertrand. *Lakeway Land Co. v. Kizer*, 796 S.W.2d 820, 822 (Tex.App.—Austin 1990, writ denied). Refusing an employee's request for a lateral transfer does not qualify as an adverse or ultimate employment decision like hiring, granting leave, discharging, promoting or compensating. *Burger v. Central Apt. Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir.1999). Further, to raise an issue of material fact based on alleged preferential treatment of younger workers, a plaintiff must show that he was "clearly better qualified" than the younger employ-

ees who were retained or promoted. *See Anderson v. Taylor Publ'g Co.*, 13 S.W.3d 56, 59 (Tex.App.—Dallas 2000, writ denied). The evidence of relative qualifications must be more than merely subjective and speculative. *Id.*

Here, Jacobs, who was not in the protected class, received the personnel manager job at Bertrand's distribution center. Jacobs had been the personnel coordinator at a Wal–Mart distribution center three times' larger than the center where Bertrand worked. He had been working in the personnel area with Wal–Mart while Bertrand had never done so. By contrast, Bertrand's experience in personnel was more than fifteen years' earlier. Jacobs had received a one-hundred percent proficiency exercise score on a personnel procedures test administered by Wal–Mart officials in February 1995. He had been recommended for a promotion to a personnel manager of a distribution center by his general manager in mid-May of 1995. Thus, there was no evidence in the record to support Bertrand's contentions that he was better qualified for the personnel manager's job under Hansen than was Jacobs.

■ As additional proof that he was constructively discharged due to age, Bertrand points to the following memorandum he and three other operations managers at the Palestine soft-goods distribution center received from Hansen on April 11, 1995. He asserts that this memorandum is proof that there was a "secret plan" by Wal–Mart to eliminate him and other older operations managers and replace them with younger, lower paid operations managers. The memo introduced as "Plaintiff's Exhibit 1" at trial had been sent to Hansen and thirty-eight Wal–Mart distribution center managers across the United States:

From: TMHANSE
To: KEVIN HARRIS–WH05
    RODNEY HUDDLESTON

Date and time 04/11/95 12:43:43
STACEY MASON–WH05
RUSSELL BERTRAND–W

Terri Hansen GM 6005
Palestine, Tx. (903) 723–4412
Subject: PRIDE
I would second this ...    You have done a great job so far.  Thanks.

* * *Forwarding note from JMWRIGH—    04/11/95 11:20 * * *

[Names of Hansen and thirty-eight managers omitted].

FROM JIMMY WRIGHT, WAREHOUSE ADMINISTRATION
Subject: PRIDE

I JUST RECAPPED ALL OF THE ACTUAL PLANS THAT YOU HAVE MADE FOR LEE SCOTT. AS I LOOKED AT YOUR PLANS AND PROJECTED THE POTENTIAL SAVINGS IN THE LAST PAY PERIOD I HAD A REAL SENSE OF PRIDE IN EVERYONE'S ABILITY TO BECOME COMMITTED TO DOING THE RIGHT THING IN AN EXCELLENT MANNER.

THE TOTAL SAVINGS IN THE LAST PAY PERIOD WILL BE AROUND $1.720 MILLION DOLLARS TO WAL–MART STORES INC. TO PUT THIS IN PERSPECTIVE YOU HAVE COMMITTED IN PAYROLL ALONE TO LOWER THE EXPENSES OF THIS COMPANY MORE IN TWO WEEKS THAT THE ENTIRE SAM'S WHOLESALE DIVISION MADE LAST MONTH.

MY HAT IS OFF TO EACH OF YOU AND I'M PROUD TO WORK WITH A TEAM THAT CAN GET BEHIND AN ISSUE AND PUT IT IN THE HOOP WHEN NEEDED.

THANKS
JIMMY WRIGHT

---

As the exhibit itself shows, Hansen sent this memo to Bertrand and three other operations managers one-and-a-half hours after she received it from Bentonville. Bertrand concedes that this memo from Hansen to Bertrand and the other operations managers would only be considered circumstantial evidence of age discrimination. ▮ Circumstantial evidence must consist of more than a scintilla to withstand a no-evidence challenge. *Litton Indus. Prod., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984). In 1998, Wendell Hall observed:

> "Any ultimate fact may be proved by circumstantial evidence. However, the legal equivalent of no-evidence exists when [meager] circumstantial evidence give[s] life to inferences equally consistent with two different propositions. Furthermore, where circumstances are equally consistent with either of two facts and 'nothing shows that one is more probable than the other, neither fact can be inferred' and the no-evidence challenge must be sustained. Circumstantial evidence still must consist more than a scintilla to withstand a no-evidence challenge." (citations omitted).

Wendell Hall, *Standards of Review in Texas*, 29 St. Mary's L.J. 351, 481–82 (1998).

Here, it can be reasonably inferred that this memorandum involved cutting payroll, *i.e.* employees. Bertrand asserts that the memorandum pertained to older, salaried middle-managers while Hansen asserts that it pertained to hourly employees. There, however, is nothing in the memorandum to indicate which inference is stronger. Thus, neither fact can be inferred. *Continental Coffee Products Co.*, 937 S.W.2d at 450; *Fifty–Six Thousand Seven Hundred Dollars in U.S. Currency v. State*, 730 S.W.2d 659, 662 (Tex.1987). Consequently, any inference from the memorandum does not create more than a scintilla of circumstantial evidence.

▮ Additionally, even if Bertrand were correct in his assertion that the April 11 memo actually did intend to reduce higher salaried employees, he has failed to establish it was on the basis of age. *See Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 147 (5th Cir.1995). Moreover, in 1990, Bertrand was hired by Wal–Mart when he was forty-one years of age. He thereafter quit the company in 1995. Thus, it is inferred that when the same company hires someone in a protected class, such as age, discrimination is not involved in that employee's termination. *See Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 175 (8th Cir.1992) *cf. Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 (5th Cir.1997); *cf. Brown*, 82 F.3d at 658. Bertrand has produced no evidence to overcome this presumption.

Having reviewed the evidence and inferences tending to support the jury's finding and disregarding all contrary evidence and inferences, we hold that Bertrand produced no evidence to show that he was constructively discharged because of his age or that there was any proof of discriminatory intent against him based on his age. Thus, Appellants' motion for a directed verdict on this issue should have been granted. We therefore sustain Wal–Mart's first issue. Having concluded that the evidence was legally insufficient to support a finding of constructive discharge, we need not address the corresponding factual sufficiency challenge.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

▮ In their second issue, Appellants contend Bertrand presented no evidence, or in the alternative, factually insufficient evidence to support a claim of

intentional infliction of emotional distress. An employee may recover damages for intentional infliction of emotional distress in an employment context as long as the employee establishes the elements of the cause of action. *See Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993). The elements of intentional infliction of emotional distress are 1) the defendant acted intentionally or recklessly; 2) the conduct was extreme and outrageous; 3) the defendant's actions caused the plaintiff emotional distress; and 4) the emotional distress that the plaintiff suffered was severe. *City of Midland v. O'Bryant,* 18 S.W.3d 209 (2000); *Brewerton v. Dalrymple,* 997 S.W.2d 212, 215 (Tex.1999). Courts must determine as a threshold matter whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Brewerton,* 997 S.W.2d at 216. To be extreme and outrageous, conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Id.* If the threshold for extreme outrageous conduct is not sufficiently rigorous, then with every termination of employment, an employer would be subject to a jury trial. *See id.* When ongoing harassment is alleged, the offensive conduct is evaluated as a whole. *GTE Southwest v. Bruce,* 998 S.W.2d 605, 611–12 (Tex. 1999).

Bertrand cites only the *Bruce* case as support for his position that there was legally and factually sufficient evidence to support an intentional infliction of emotional distress claim. In *Bruce,* the supreme court cautioned that a claim for intentional infliction of emotional distress does not lie for ordinary employment disputes and that the kind of extreme conduct necessary to raise a fact question of intentional infliction of emotional distress in the workplace exists only in the most unusual circumstances. *Bruce,* 998 S.W.2d at 612–13. That admonition grew out of the recogni-

tion that employers need to be able to supervise, review, criticize, demote, transfer, discipline and terminate employees. *Id.* at 612. These circumstances are often stressful and unpleasant for an employee and at times may even be unwarranted. *Id.* Nevertheless, "an employer must have latitude to exercise these rights in a permissible way even though emotional distress results." *Id.* at 612–13; *see City of Midland,* 18 S.W.3d at 217.

In *Bruce,* the supervisor was a former U.S. Army Supply Sergeant who had been working for GTE more than twenty years when the events constituting intentional infliction of emotional distress began. *Bruce,* 998 S.W.2d at 608. The plaintiffs were three women who eventually had to seek medical treatment for emotional distress caused by the supervisor's conduct. *Id.* at 608–09.

Wal–Mart and Hansen agree that her actions exhibited "bad management and poor people skills" but contend that none of her actions and words directed to Bertrand would constitute intentional infliction of emotional distress. We agree. A comparison of the evidence of extreme and outrageous conduct in *Bruce* as opposed to that in the instant case reveals that Bertrand cannot satisfy the second element of his cause of action for intentional infliction of emotional distress. In *Bruce,* the GTE supervisor's behavior, which was found to be extreme and outrageous, consisted of the following:

1. Obscene jokes, vulgar cursing, and sexual innuendo on a regular basis;

2. Using the "f___" word as part of his normal conversation;

3. After one of the plaintiffs asked the supervisor to curb his offensive language, the supervisor responded, "I will do and say any damn thing I want. And I don't give a s___ who likes it."

4. Physically and verbally threatening and terrorizing the plaintiffs;

5. Continuously in a rage;

6. Frequently assaulting each of the plaintiffs by physically charging at them with his hands in the shape of a fist and stopping uncomfortably close to their faces while screaming and yelling;

7. Told one plaintiff, "You're going to be in the unemployment line"; that he had been sent to fire her; and another time typed "quit" on his computer and said, "That's what you can do."

8. Called one plaintiff into his office **every day** and would have her stand in front of him, sometimes for as long as thirty minutes, and simply stared at her; the plaintiff was not allowed to leave the office until she was dismissed, even while the supervisor talked on the phone or read papers; this often occurred **several times a day.**

9. Supervisor yelled and screamed when he discovered a spot on the carpet; made plaintiff get on her hands and knees and clean the spots while he stood over her yelling;

10. One day after another plaintiff forgot her paperwork, the supervisor ordered her to wear a post-it note on her shirt that said, "Don't forget your paperwork."

*Id.* at 613–14.

Compare these facts with Bertrand's evidence complaining about Hansen:

1. Asked him if he was ready to transfer one .week after assuming her responsibilities as general manager of the Palestine soft-goods distribution center.

2. Always appeared angry when meeting with him.

3. Raised her voice when she was evaluating him and would slam her hands down on the table during their meetings in her office.

4. Would constantly criticize him without giving him specifics or pointing to any specific policy that he was not following.

5. Did not tell him which associates at the distribution center were complaining about him and his style of management.

6. Told him associates thought he was "Bozo the Clown" and that she agreed with them.

7. Insulted and embarrassed him before his co-workers by referring to him as "Bozo the Clown."

8. Did not allow him to attend his daughter's mid-week softball games over a four-week period so that he could eliminate an alcohol problem occurring during his shift.

The facts in the instant case simply do not constitute more than a scintilla of evidence in support of the second element, *i.e.,* that Hansen's conduct was extreme and outrageous. The *Bruce* plaintiffs were subjected to the behavior of their superior for more than two-and-a-half years for the entire workday. Bertrand only worked under Hansen for five months and their shifts did not overlap but a few hours each day. The *Bruce* plaintiffs required medical attention while Bertrand never sought it. Bertrand never alleged that Hansen used offensive language, but the *Bruce* record is replete with it. It was never suggested to Bertrand that he was going to be fired or that he should quit, while in *Bruce* those messages were specifically communicated by the superior. Moreover, Bertrand was never required by Hansen to assume a physically subservient position as did the complainant in *Bruce*. Hansen was described as angry by Bertrand but never in a rage, as the superior in *Bruce* had been.

All of the actions and words attributed by Bertrand to Hansen were within the scope of supervising, reviewing, criticizing, and disciplining him or resulted from those activities. We therefore hold that these activities constituted part of the ordinary employment relationship and are not actionable as a matter of law under the tort

of infliction of emotional distress. Bertrand failed to introduce any evidence in support of the second element. Therefore, without discussing the remaining elements, we conclude that the trial court erred when it failed to grant Wal–Mart and Hansen's motion for a directed verdict.[4] Wal–Mart and Hansen's legal sufficiency challenge contained in issue number two is therefore sustained. Having sustained Appellants' legal sufficiency challenge under issue two, the corresponding factual sufficiency challenge will not be addressed.

## CONCLUSION

Because determination of the first two issues raised by Wal–Mart and Hansen are dispositive of this case, we need not address the remaining four issues. Accordingly, we reverse the judgment of the court below and render judgment that Bertrand take nothing against Wal–Mart or Hansen.

---

4. It should be noted, however, that the record is also devoid of any evidence establishing the fourth element, *i.e.*, that Bertrand suffered severe emotional distress.