

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00378-CV

_____

UNIVERSITY OF NORTH TEXAS SYSTEM, Appellant

V.

LISA BARRINGER, Appellee

---

On Appeal from County Court at Law No. 2
Denton County, Texas
Trial Court No. CV-2017-00827

---

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

In this accelerated interlocutory appeal,[1] Appellant University of North Texas System appeals the trial court's denial of its plea to the jurisdiction in this age-discrimination and retaliation case brought by Appellee Lisa Barringer. In four issues, UNT argues that the trial court erred by denying its plea because (1) Barringer did not suffer an adverse employment action, (2) Barringer failed to establish she was replaced or treated disparately, (3) Barringer failed to establish an adverse employment action or a causal connection between her supervisor's knowledge of any alleged protected activity by her and the reason she left UNT's employment, and (4) Barringer did not present sufficient evidence of pretext by UNT. Because we conclude that the jurisdictional evidence proves that Barringer resigned of her own free will and that she was not constructively discharged, we reverse the trial court's order denying UNT's plea to the jurisdiction and render judgment that this case be dismissed for want of subject-matter jurisdiction.

### II. BACKGROUND

Barringer, who at the time this suit was filed was fifty-one years old, began working for UNT in March 2013 as its sole human resources (HR) project manager.

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8); Tex. R. App. P. 28.1(a).

Barringer's duties initially included various HR compliance and technology projects, but later, she was also assigned projects involving HR administrative responsibilities.

According to Barringer, she had always received "an overall rating of exceeding expectations" on her informal and formal performance reviews. Initially, Barringer reported to either Alan Clemson or Steve Sosland, but in November 2014, Luis Lewin became Barringer's direct supervisor.

By Barringer's account, no later than early 2015, Lewin transferred his executive assistant, Louise Hall, who was over seventy years old at the time, to another position under one of his subordinates for the purpose of terminating Hall's employment. Afterward, Lewin hired Addyson Green, an individual under thirty years of age, to replace Hall. Lewin allegedly then began to assign Green administrative projects and duties that had traditionally been Barringer's responsibilities. He also began to remove most of Barringer's compliance and technology projects from her and assign them to other employees.

Barringer contended that she sought direction from Lewin regarding her work on human resources compliance and technology projects, but that Lewin was "non-communicative with respect to her request for assistance . . . to the point of absolutely ignoring her." Barringer claims that she complained to UNT's HR representatives about Lewin, but she was afforded no remedy. On August 12, 2016, as she was seeking assistance from him regarding a project she was working on, Lewin confronted Barringer. According to Barringer, Lewin subjected her to a "harangue"

that included Lewin's allegations that she had been inadequately performing her duties for the prior six months and that she was not well liked by other employees. During this encounter, Lewin allegedly also "threatened" her with administrative leave and an investigation based on complaints by others regarding her performance as co-presenter of a recent HR workshop.

Barringer pleaded that "[i]n the face of Lewin's unjustified threat of administrative leave, investigation and discipline and threat of termination only, and for no other reason, [she] was constructively discharged from her position." Specifically, Barringer alleged that she had to quit "with good cause" because she was dissatisfied with Lewin's lack of communication and feedback and because he had made false claims of her inadequate performance. Afterward, Lewin allegedly eliminated Barringer's position, hired an assistant for Green (who is also under the age of thirty), and promoted Green with an increase in salary.

Barringer filed a claim of discrimination with the Equal Employment Opportunity Commission and subsequently received a notice of right to file a civil action against UNT from the Texas Workforce Commission. Barringer later filed this suit in April 2017, claiming age discrimination and (eventually) retaliation in violation of Chapter 21 of the Texas Labor Code. *See* Tex. Lab. Code Ann. § 21.055. More than two years later, UNT filed its plea to the jurisdiction claiming that it had sovereign immunity from this suit under the Texas Labor Code because Barringer could not meet all prima facie elements of her claims. Among several arguments,

4

UNT claimed that the jurisdictional evidence proved that Barringer had not suffered an adverse employment action by being constructively discharged, an element to both her age-discrimination and retaliation claims. As part of its plea, UNT attached several exhibits including Barringer's and Lewin's depositions.

In her deposition, Barringer testified that she had initiated the meeting with Lewin where he told her that it had been reported to him that at the HR workshop Barringer had made disparaging remarks about upper management and had made a pejorative comment regarding Muslims. Barringer said that she admitted to Lewin that she was "unprepared" to present the workshop, but she denied having made the pejorative comment, and she attributed her other comments to her joking.

According to Barringer, Lewin told her that because of her performance in the workshop, including the statements she allegedly made, he was going to place her on administrative leave while he was away on vacation and that there would be an investigation into her conduct at the workshop when he returned. Barringer said that she asked Lewin whether he was going to fire her, and he told her that he had not decided:

> Q:   Okay. Did he tell you he was contemplating terminating you?
>
> A:   He said he hadn't decided.
>
> Q:   He did not say that he was contemplating it, based on all the complaints about [your] behavior?
>
> A:   No.

5

By Barringer's account, the insinuation that Lewin did not know whether he was going to fire her and that he would not decide until he returned from his two-week vacation left a cloud of uncertainty over her "that was just torture for no reason." Barringer admitted that she told Lewin that she did not want to go through an investigation. And Barringer said that shortly after the meeting, she gave Lewin a two-week notice[2] that she would be resigning, but "he refused" to let her serve out the two weeks, and her resignation became effective immediately.

Lewin testified in his deposition that he had told Barringer that he was placing her on administrative leave with pay while he was on vacation because of the alleged comments she had made at the HR workshop. Consistent with Barringer's deposition

---

[2]While Barringer said that she gave a two-week notice, her August 12, 2016 resignation letter states:

> It is with a great deal of sadness that I tender my resignation as Project Manager for the HR Department at the University of North Texas System effective today, August 12th.
>
> My tenure in this role has been at times frustrating and discouraging but also fun and challenging.
>
> I continue to be a proud UNT Alumni and I wish the HR team all the best as they strive to improve and succeed.

Barringer testified that she was "trying to resign with as much dignity and professionalism as I could."

testimony,[3] Lewin said that Barringer is the one who asked whether he was contemplating firing her, and he responded, "I'm contemplating it, but I'm going to place you on administrative leave pending an investigation."

By Lewin's account, less than an hour after this conversation, Barringer informed him that she was resigning. Because of that, Lewin said that a formal investigation never took place, but if it had, someone outside of HR would have conducted it:

> Q:      But you never did the investigation because she refused?
>
> . . . .
>
> A:      I couldn't do the investigation without her—giving her, you know, a fair chance to tell her story.
>
> Q:      So is that a formal, like, interview? Would you be doing the interview, or would it be a third party?
>
> A:      We had—we had a practice in HR that if there was a complaint about an HR—with an HR person, we would never make the investigation. We would call the General Counsel and ask them to recommend a third party from the outside to do an investigation not to show any bias, you know, or unfairness in the investigation, per se.
>
> Q:      So you couldn't threaten [Barringer] with an investigation by you, correct?
>
> . . . .
>
> A:      Correct.

---

[3]Barringer testified in her deposition that Lewin had told her that the reason he was placing her on administrative leave was because he was "going on vacation, and I don't want to deal with this now."

Lewin stated that had an investigation revealed that Barringer had not made the offensive statements in the HR workshop, she "[a]bsolutely" would have retained her job. But Lewin said that he did not believe Barringer when she said she had not made inappropriate or pejorative comments in the HR workshop.[4]

UNT also provided the trial court with Hall's affidavit. Hall stated that she never heard Lewin describe her as "old school" and that she did not believe that Lewin or any other UNT employee ever treated her differently or unfairly "because of [her] age." She also swore that Barringer had never complained to her "about any age discrimination by [Lewin]."

After having a hearing on UNT's plea to the jurisdiction, the trial court denied the plea. This appeal followed.

### III. DISCUSSION

In its first issue, UNT argues that Barringer failed to establish an adverse employment action and that because an adverse employment action is necessary to establish a prima facie case of either age discrimination or retaliation, Barringer failed to produce sufficient evidence of a critical element to both of her claims. Specifically,

---

[4]Also attached to UNT's plea to the jurisdiction are what appear to be two completed feedback forms from attendees of the HR workshop. One form indicated that Barringer did "not seem prepared" for the workshop and that she "sometimes seemed a bit insulting to the group." Another form had the comment that Barringer was "a little unprepared" for the workshop. Barringer's co-presenter of the workshop—the employee who allegedly brought Barringer's conduct in the workshop to Lewin's attention—on the other hand received reviews of being "excellent" and "Wonderful! A++!"

8

UNT argues that Barringer failed to rebut UNT's evidence that she was not constructively discharged. Thus, UNT argues, the trial court erred by denying its plea. We agree.

## A. Standard of Review

A trial court's ability to hear a case lies in its subject-matter jurisdiction. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). "A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction." *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004) (citing *Bland*, 34 S.W.3d at 554). A plea to the jurisdiction may be used to assert governmental immunity and defeat a court's subject-matter jurisdiction. *Id.* A trial court's ruling on a plea to the jurisdiction is reviewed de novo. *Suarez v. City of Tex. City*, 465 S.W.3d 623, 632 (Tex. 2015).

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, just as the trial court must do. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004); *Bland*, 34 S.W.3d at 555. If the evidence creates a fact question on the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the factfinder will resolve the question. *Miranda*, 133 S.W.3d at 227–28. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea as a matter of law. *Id.* at 228. The standard mirrors our review of summary judgments, where we

9

take as true all evidence favorable to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009).

## B. Waiver of Governmental Immunity and the *McDonald Douglas* Framework

Both of Barringer's claims fall under the Texas Commission on Human Rights Act (TCHRA). *See* Tex. Lab. Code Ann. §§ 21.051 (age discrimination), 21.055 (retaliation). The TCHRA waives governmental immunity but only in those instances in which "the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). Absent a pleading stating a claim under the TCHRA, the governmental entity's immunity from suit has not been waived. *Id.* at 637.

There are two alternative methods by which a plaintiff can establish discrimination or retaliation under the TCHRA. *See Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476–77 (Tex. 2001). An employee can offer direct evidence of the employer's discriminatory actions or words. *Id.* at 476. Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption. *Coll. of the Mainland v. Glover*, 436 S.W.3d 384, 392 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Alternatively, because direct evidence of discrimination or retaliation is a "rarity" in employment cases, courts allow claims to proceed with indirect or circumstantial evidence of discrimination or retaliation. *See Russo v. Smith Int'l, Inc.*,

10

93 S.W.3d 428, 434 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). Under this second method, which applies in this case, Texas courts follow the burden-shifting mechanism set forth by the United States Supreme Court in *McDonnell Douglas*.[5] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 1824–26 (1973); *Glover*, 436 S.W.3d at 392.

Under the *McDonnell Douglas* framework, as applied to the TCHRA, the plaintiff is entitled to a presumption of discrimination if the plaintiff meets the "minimal" initial burden of establishing a prima facie case of discrimination. *See Mission Consol.*, 372 S.W.3d at 634. The prima facie case raises an inference of discrimination because courts presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. *See id.* Once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *See M.D. Anderson Hosp. & Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (per curiam). A plaintiff "will only be required to submit evidence if the defendant presents evidence negating one of" the basic facts that make up the prima facie case. *Mission Consol.*, 372 S.W.3d at 637.

---

[5]Analogous federal statutes and the cases interpreting them guide our reading of the TCHRA. *Mission Consol.*, 372 S.W.3d at 634.

**C. Adverse Employment Action and Constructive Discharge**

An age discrimination prima facie case requires that the plaintiff show that she suffered an adverse employment action. *See Mission Consol.*, 372 S.W.3d at 634; *Bowen v. El Paso Elec. Co.*, 49 S.W.3d 902, 908 (Tex. App.—El Paso 2001, pet. denied). Likewise, a retaliation prima facie case requires the plaintiff to produce evidence that she suffered an adverse employment action.[6] *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 789 (Tex. 2018); *Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 329 (Tex. App.—Texarkana 2008, pet. denied); *Dias v. Goodman Mfg. Co., L.P.*, 214 S.W.3d 672, 676 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). One way of demonstrating an adverse employment action is with proof that an employee was constructively discharged. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 805 (Tex. 2010).

A constructive discharge occurs when an employer makes conditions so intolerable that an employee reasonably feels compelled to resign. *See Baylor Univ. v. Coley*, 221 S.W.3d 599, 604–05 (Tex. 2007) (citing *Penn. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 2351 (2004)); *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174, 177 (Tex. App.—Houston [14th Dist.] 1991, no writ). Many factors are relevant

---

[6]Citing *Burlington Northern & Santa Fe Railway Co. v. White*, Barringer claims that an "adverse employment action . . . is actually not required to establish an actionable claim of retaliation . . . ." 548 U.S. 53, 69–70, 126 S. Ct. 2405, 2415–16 (2006). But the Supreme Court of Texas explained in *Alamo Heights* that an employee must experience a "material adverse employment action" to establish a prima facie case of retaliation under the TCHRA. 544 S.W.3d at 782.

to the consideration of whether the plaintiff was constructively discharged, including evidence of badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation. *Davis v. City of Grapevine*, 188 S.W.3d 748, 766 (Tex. App.—Fort Worth 2006, pet. denied), *abrogated on other grounds by Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 87 (Tex. 2018). In deciding if the work conditions meet that standard, courts consider a number of employer actions, such as demotion or a reduction in salary or job responsibilities. *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 481 (5th Cir. 2008). But potential disciplinary action, investigations into alleged work-place violations, or work-place criticisms are insufficient alone to cause a reasonable person to resign. *See Wal-Mart Stores, Inc. v. Bertrand*, 37 S.W.3d 1, 9 (Tex. App.—Tyler 2000, pet. denied). And courts "have repeatedly held that complaints of ostracism and personality conflicts, unfair criticism, and heated exchanges are petty annoyances, not conduct likely to deter an employee from making a discrimination complaint." *Alamo Heights*, 544 S.W.3d at 789; *see also Burlington*, 548 U.S. at 68, 126 S. Ct. at 2415 (reasoning that "'personality conflicts at work that generate antipathy' and 'snubbing by supervisors and co-workers' are not actionable" under Title VII) (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996)).

Evidence that an employee was forced to choose between resigning or being fired may also be sufficient to raise a fact issue regarding constructive discharge. *Gardner v. Abbott*, 414 S.W.3d 369, 383 (Tex. App.—Austin 2013, no pet.); *Perret v.*

13

*Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338–39 (5th Cir. 2014). In these so-called "ultimatum" cases, courts require something beyond the employee's subjective belief that termination was inevitable. *See Perret*, 770 F.3d at 338–39 (holding that employees were not given ultimatum when employer placed employees on a performance improvement plan, which was the last step in employer's process for terminating employees); *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997) (reasoning ultimatum standard met when supervisor told employee he should find another job, and he had one week before he would be placed on indefinite unpaid leave); *Davis*, 188 S.W.3d at 766 (holding ultimatum standard met when manager informed employee that "it would be in his best interest if he decided to resign rather than be terminated because future employers may ask the City whether Davis resigned or was terminated").

## D. No Evidence of Constructive Discharge

Barringer argues, as she did in the trial court, that the cumulation of Lewin's recent unsatisfactory performance reviews of her, his telling her that she was unliked by her coworkers, his assuming the truthfulness of the allegation that she had made inappropriate comments at the HR workshop, his alleged position that an investigation would not change his mind about terminating her employment, and his actual threat of termination all led her to reasonably believe she needed to resign. We disagree.

14

Regarding Lewin's recent unsatisfactory performance reviews, it is well-established that work-place criticisms are insufficient to cause a reasonable person to resign for purposes of establishing constructive discharge. *Bertrand*, 37 S.W.3d at 9. As to Lewin's telling Barringer that she was disliked by fellow employees, this comment amounts to nothing more than potentially unfair criticism about personality conflicts and is "not conduct likely to deter an employee from making a discrimination complaint." *Alamo Heights*, 544 S.W.3d at 789.

The evidence also does not support Barringer's contention that Lewin had already assumed the truthfulness of the allegations against her and thus an alleged investigation would have been a sham. Indeed, Lewin testified at his deposition that he intended to have these claims investigated once he returned from his two-week vacation and that had the results of an investigation exonerated Barringer, she would have "[a]bsolutely" retained her position at UNT. Further, investigations into alleged work-place violations are insufficient alone to cause a reasonable person to resign. *Bertrand*, 37 S.W.3d at 9. Additionally, believing one employee's version of events over another's is not evidence of constructive discharge. *Tex. State Office of Admin. Hearings v. Birch*, No. 04-12-00681-CV, 2013 WL 3874473, at *8 (Tex. App.—San Antonio July 24, 2013, pet. denied) (mem. op.) (reasoning that belief in "one employee's statements over another's is not supportive of a claim for constructive discharge. If so, employers would be subject to a constructive discharge claim each time there was a dispute between two or more employees . . . .").

15

Barringer points to no evidence in the record that Lewin did not intend to do exactly what she testified he told her, which was that he was placing her on paid leave pending an investigation. And to the extent that Barringer contends that Lewin's testimony that he did not believe her explanations for what occurred at the HR workshop demonstrates that he had already predetermined to terminate her employment, Barringer has pointed to no evidence in the record contradicting Lewin's testimony that he told her that an investigation into these allegations would occur prior to making a decision as to her employment. Moreover, the evidence demonstrates that Lewin would not have been the one conducting the investigation into Barringer's behavior at the HR workshop, and Lewin said he did not have the authority to threaten Barringer with an investigation by him.

And to the extent that Barringer contends that her allegations that Lewin took away a project that Barringer wanted and gave it to a younger employee constitutes a factor demonstrating constructive discharge, even if a change in job assignments is based on discriminatory action, that alone, without the presence of aggravating factors,[7] is not sufficient to show constructive discharge. *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 755 (5th Cir. 1986), *remanded in part on other grounds*, 491 U.S. 701,

---

[7]"Aggravating factors" include hostile working conditions and any other evidence suggesting any invidious intent on the part of the employer in creating or perpetuating the intolerable conditions compelling retirement or resignation. *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981). Barringer has not pointed to any evidence showing that she experienced perpetually intolerable conditions compelling her resignation.

109 S. Ct. 2702 (1989). Furthermore, constructive discharge cannot be based upon the employee's subjective preference for one position over another. *Id.*

Barringer also contends that Hall was fired[8] and replaced by a younger worker and that Hall had been subjected to age discrimination and that this is a factor demonstrating she was constructively discharged. In her affidavit, however, Hall stated that she had never been subjected to age discrimination by Lewin or any UNT employee, that she had never heard Lewin describe her as "old school," and that Barringer had never complained to her (Hall) "about any age discrimination by [Lewin]." We conclude that not only is there no evidence that Hall was subjected to age discrimination, the contrary is true: UNT presented undisputed evidence that Hall never experienced age discrimination at UNT. If the relevant undisputed evidence negates jurisdiction, then the plea to the jurisdiction must be granted. *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007).

Additionally, there is no evidence that Lewin threatened Barringer with terminating her employment. First, Barringer is the one who initiated the meeting with Lewin. Second, Barringer's own testimony establishes that Lewin had not

---

[8]Hall disputes that she was fired. Rather, Hall stated in her September 18, 2019 affidavit,

> After I retired in April 2016, I was rehired a few weeks later with [Lewin's] approval to work in the System Human Resources Department on a part-time basis. This allowed me to collect my full retirement benefits and also continue to work for the System. I am still currently employed in this position.

17

mentioned firing Barringer until she asked him whether he was considering firing her. Indeed, Barringer admitted in her deposition that when she did ask Lewin whether he would fire her, he said that he had not yet decided. Third, Barringer's belief that it was "torture" to be placed on paid administrative leave while Lewin was away for two weeks is nothing more than Barringer's subjective belief that termination was inevitable. *Faruki*, 123 F.3d at 319. Fourth, the resignation letter that Barringer sent on the day of the meeting with Lewin makes no mention of any termination.

In coming to a different conclusion, Barringer argues that *Faruki* supports her position that she had effectively been given an ultimatum, but in *Faruki* the plaintiff's deposition testimony was that the employer had specifically told him that he "should find another job, as [the employer] would be unable to retain him, and that he had one week before he would be placed on indefinite unpaid leave." *Id.* There is simply no evidence in this record that Lewin told Barringer that she should find another job or that she would be placed on unpaid leave. In fact, both Lewin's and Barringer's deposition testimony established that Lewin intended to place Barringer on paid leave pending his return from vacation and an investigation into Barringer's alleged statements made at the HR workshop. In short, *Faruki* and this case have very little in common. Accordingly, Barringer has failed to present any evidence that Lewin made conditions at work so intolerable that she reasonably felt compelled to resign. *See Coley*, 221 S.W.3d at 604–05.

Because the undisputed evidence negated one of the prima facie elements to both her age-discrimination and retaliation claims (an adverse employment action in the form of constructive discharge) and Barringer's evidence failed to raise a fact issue on that element, the trial court erred by denying UNT's plea to the jurisdiction. We sustain UNT's first issue. Because our resolution of UNT's first issue is dispositive of this case, we need not address UNT's remaining three issues. *See* Tex. R. App. P. 47.1.

## IV. CONCLUSION

Having held that the trial court erred by denying UNT's plea to the jurisdiction, we reverse the trial court's order and render judgment that Barringer's suit be dismissed for lack of the trial court's subject-matter jurisdiction.

/s/ Dana Womack

Dana Womack
Justice

Delivered: September 10, 2020

19