

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00681-CV

**THE TEXAS STATE OFFICE OF ADMINISTRATIVE HEARINGS**,
Appellant

v.

Carol **BIRCH**, Charles Homer, Ann Landeros, and Carol Wood,
Appellees

From the 419th District Court, Travis County, Texas
Trial Court No. D-1-GN-09-004285
The Honorable Gisela D. Triana-Doyal, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:    Catherine Stone, Chief Justice
            Sandee Bryan Marion, Justice
            Marialyn Barnard, Justice

Delivered and Filed:  July 24, 2013

AFFIRMED IN PART, REVERSED AND RENDERED IN PART

        This is the second interlocutory appeal relating to this matter that has been transferred to

this court from the Third Court of Appeals.  This appeal, like the first one, challenges the trial

court's denial of a plea to the jurisdiction filed by appellant The State Office of Administrative

Hearings ("the SOAH") with regard to wrongful termination claims filed by appellees Carol Birch,

Charles Homer, Ann Landeros, and Carol Wood (collectively "appellees" or "the former judges"),

who are former Administrative Law Judges ("ALJs").  The SOAH contends the trial court lacked

jurisdiction to hear the former judges' claims because they failed to offer evidence of certain aspects of their prima facie claims. We affirm in part, and reverse and render in part.

## BACKGROUND

The SOAH is a state agency "created to serve as an independent forum for the conduct of adjudicative hearings in the executive branch of state government." TEX. GOV'T CODE ANN. § 2003.021(a) (West 2008). To this end, the SOAH employs administrative law judges to conduct hearings, take evidence, issue orders, and issue proposals for decision ("PFD") that include findings of fact and conclusions of law. *Id.* §§ 2003.041(a), 2003.042(a). Birch, Homer, Landeros, and Wood were employed by the SOAH as ALJs.[1] Landeros resigned in 2008, Birch and Wood resigned in lieu of termination for cause in 2009, and Homer resigned in 2008, but claims he was subsequently fired before the date he intended to leave the SOAH. Thereafter, the former judges filed suit in December 2009, alleging: (1) employment discrimination and retaliation under the Texas Commission on Human Rights Act ("TCHRA"),[2] the relevant portions of which are now codified in Chapter 21 of the Texas Labor Code, specifically sections 21.051 and 21.055[3]; and (2)

---

[1] Birch was employed by the SOAH from June 2004, until March 2009. Homer was employed from May 2004, until September 2008. Landeros was an ALJ with the SOAH from January 1995, until November 2008. Wood was employed by the SOAH from September 1, 1995, until January 12, 2009.

[2] In 1983, the Texas Legislature created the Texas Commission on Human Rights through the TCHRA to align Texas law with federal law with regard to employment discrimination. *Lueck v. State*, 325 S.W.3d 752, 754 n.1 (Tex. App.— Austin 2010, pet. denied). The relevant portions of the TCHRA have now been codified in Chapter 21 of the Texas Labor Code. *Id.* (citing TEX. LAB. CODE ANN. §§ 21.001-.556 (West 2006)). Moreover, the Legislature has abolished the Commission, transferring its functions to the civil rights division of the Texas Workforce Commission. *Id.* (citing TEX. LAB. CODE ANN. § 21.0015). For convenience, we will refer to the provisions of Chapter 21 of the Labor Code as the TCHRA.

[3] Section 21.051 of the Texas Labor Code provides that an employer commits an unlawful employment practice if the employer, because of race, color, disability, religion, sex, national origin, or age:

> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges or employment; or
> (2) limits, segregates or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

a common law wrongful termination claim based on *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).

More specifically, in their first petition, all of the former judges claimed violations of the TCHRA, specifically disparate treatment and discrimination based on age, and all four asserted retaliation claims. Birch alleged discrimination based on disability, and Birch, Landeros, and Wood claimed discrimination and retaliation based on gender. All four of the former judges also alleged common law wrongful termination in violation of Texas public policy, claiming their terminations were in retaliation for their opposition to "illegal crony favoritism" and to "illegal practices in the operation of state agencies tasked with the administration of judicial and quasi-judicial functions." This last, collective common law claim was based on *Sabine Pilot*, in which the Texas Supreme Court held that an at–will employee could sue his employer for wrongful termination if he was terminated because he refused to perform an illegal act. *See id.* at 734–35.

In response, the SOAH filed a plea to the jurisdiction based on sovereign immunity, arguing the trial court lacked subject matter jurisdiction over the former judges' common law, *Sabine Pilot* claim. The trial court denied the plea, and the SOAH appealed. On appeal, this court recognized *Sabine Pilot* involved only non-governmental employees, and noted that the courts that had addressed the issue had declined to extend the *Sabine Pilot* exception to the at–will employment doctrine to governmental employees. *Tex. State Office of Admin. Hearings v. Birch*, No. 04-10-00777-CV, 2010 WL 5141647, at *1 (Tex. App.—San Antonio Dec. 15, 2010, no pet.) (citing *Midland Indep. Sch. Dist. v. Watley*, 216 S.W.3d 374, 376 (Tex. App.—Eastland 2006, no pet.); *Nueces Cnty. v. Thornton*, No. 13-03-011-CV, 2004 WL 396608, at *5 (Tex. App.—Corpus

---

TEX. LAB. CODE ANN. § 21.051 (West 2006). Section 21.055 provides that an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who: "(1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." *Id.* § 21.055.

Christi Mar.4, 2004, no pet.); *Salazar v. Lopez*, 88 S.W.3d 351, 353 (Tex. App.—San Antonio 2002, no pet.); *Univ. of Tex. Med. Branch at Galveston v. Hohman*, 6 S.W.3d 767, 777 (Tex. App.—Houston [1st Dist.] 1999, pet. dism'd w.o.j.); *Carroll v. Black*, 938 S.W.2d 134, 134–35 (Tex. App.—Waco 1996, writ denied)). Rather, the courts held that a governmental entity retains its sovereign immunity when an employee raises a common law, *Sabine Pilot* cause of action. *Id.* We further noted the former judges had failed to provide any authority for a waiver of immunity for their common law claims. *Id.* Accordingly, we held the trial court lacked subject matter jurisdiction over the former judges' common law, *Sabine Pilot* claims, and we reversed the trial court denial's of the SOAH's plea on these claims. *Id.* at \*2.

Ultimately, the former judges filed a third amended petition, adding Cathleen Parsley as a defendant in her official capacity as the SOAH's Chief Administrative Law Judge, and reasserting their TCHRA claims under sections 21.051 and 21.055 of the Labor Code.[4] The former female judges claimed "disparate treatment and disparate impact gender discrimination" under section 21.051, all four of the former judges claimed "disparate treatment and disparate impact age discrimination" under section 21.051, and all four claimed retaliation under section 21.055. Birch individually claimed disability discrimination under section 21.051 for Attention Deficit Disorder, depression, anxiety, and carpal tunnel syndrome.

In response, the SOAH filed separate partial pleas to the jurisdiction as to each former judge, arguing each former judge could not provide evidence of certain critical prima facie elements of their claims against the SOAH. The SOAH claimed that because each former judge

---

[4] According to the brief filed by the former judges, after this court's original decision, they filed a second amended petition in which Cathleen Parsley was added as a defendant. The second amended petition included their prior statutory claims as well as new common law claims. In response, the SOAH filed a plea to the jurisdiction as to this petition, seeking dismissal of the new common law claims. The former judges state in their brief that the trial court issued a letter granting the second plea to the jurisdiction, but advised that no formal order was prepared. None of these documents–the second amended petition, the second plea to the jurisdiction, or the trial court's letter ruling– appear in the clerk's record.

was unable to provide sufficient evidence to create a genuine issue of fact for trial, none had invoked the waiver of sovereign immunity under the TCHRA, which precluded the trial court from exercising jurisdiction. The former judges filed a response in opposition. After a non-evidentiary hearing, the trial court denied the SOAH's pleas to the jurisdiction. The SOAH perfected this appeal.

## ANALYSIS

In this appeal, the SOAH contends the trial court erred in denying its pleas to the jurisdiction as to all of the former judges' claims because the former judges failed to offer evidence of certain aspects of each of their prima facie claims. More specifically, the SOAH contends none of the former judges offered evidence: (1) that any similarly situated employees were treated more favorably than them; and (2) of any protected conduct. With regard to Landeros and Homer, the former judges who resigned – although Homer contends he was terminated after tendering his retirement notice, but before it was effective – the SOAH contends they failed to offer evidence of: (1) any adverse employment action at the hands of the SOAH that was motivated by discrimination or retaliation; or (2) any condition of employment at SOAH that was so intolerable that an objectively reasonable employee would have felt compelled to resign.

### *Standard of Review*

A plea to the jurisdiction is a dilatory plea challenging a trial court's subject matter jurisdiction over a specific cause of action. *Mission Consol. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). The purpose of the plea is "to defeat an action 'without regard to whether the claims asserted have merit.'" *Id.* (quoting *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). "However, a plea to the jurisdiction can also properly challenge the *existence* of those very jurisdictional facts." *Garcia*, 372 S.W.3d at 635. In such cases, the court may consider evidence as necessary to resolve any dispute over the jurisdictional facts, even if the evidence

"implicates both the subject-matter jurisdiction of the court and the merits of the case." *Id.* (quoting *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

When the court is required to consider evidence relating to a dispute over jurisdictional facts, its review of the plea "mirrors that of a traditional summary judgment motion." *Garcia*, 372 S.W.3d at 635 (citing *Miranda*, 133 S.W.3d at 228); *see* TEX. R. CIV. P. 166a(c). Accordingly, we review the matter under a de novo standard and take as true all evidence favorable to the nonmovant. *Miranda*, 133 S.W.3d at 228. We must also indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Id.*

In a plea to the jurisdiction, the defendant, i.e., the party asserting the plea, must first establish as a matter of law that the trial court lacks jurisdiction. *Id.* This requirement protects a plaintiff from having to put on his case simply to establish jurisdiction. *Miranda*, 133 S.W.3d at 228. If the defendant carries its burden, the plaintiff then has the burden to show a disputed material fact issue exists regarding the jurisdictional issue. *Id.* If a fact issue exists, the trial court must deny the plea. *Garcia*, 372 S.W.3d at 635. However, if the relevant evidence is undisputed or the plaintiff fails to raise a fact issue relating to jurisdiction, the trial court should grant the plea as a matter of law. *Id.*

### *Applicable Law*

In its plea in this case, the SOAH argued the trial court lacked jurisdiction over the former judges' TCHRA claims because they could not prove a prima facie case of discrimination and retaliation as a matter of law, thereby negating any waiver of immunity. This argument necessarily asserts that the elements of the prima facie case are jurisdictional facts, and a trial court has no jurisdiction over a TCHRA discrimination or retaliation suit against a government employer when the plaintiffs cannot meet their prima facie burden. In other words, whether immunity has been waived, thereby permitting the trial court to exercise jurisdiction over the matter, turns on whether

the former judges have alleged and can provide jurisdictional facts evidencing an actual claim under the TCHRA. *See State v. Lueck*, 290 S.W.3d 876, 881 (Tex. 2009) (holding that in determining whether court had jurisdiction in Whistleblower Act claim against government, elements of claim had to be considered to ascertain whether violation had been alleged, thereby concluding elements of claim are jurisdictional facts). As discussed below, Texas courts have indeed held that although the TCHRA waives immunity, immunity is waived only when a plaintiff submits evidence in support of a prima facie claim under the TCHRA.

Sovereign immunity deprives a trial court of jurisdiction in suits in which the state or certain governmental entities have been sued unless the state consents to suit. *Garcia*, 372 S.W.3d at 636 (citing *Lueck*, 290 S.W.3d at 880). The supreme court has reviewed the TCHRA to determine whether the state consented to suits brought thereunder and specifically held "the TCHRA clearly and unambiguously waives immunity" for suits brought under the TCHRA. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008) ("*Garcia I*"). However, the court also recognized the Legislature has waived immunity from such suits only when the plaintiff "actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Garcia*, 372 S.W.3d at 636. As the court stated:

> . . . [A] plaintiff must actually bring[ ] an action or proceeding under this chapter in order to have the right to sue otherwise immune governmental employers. . . . The prima facie case is the necessary first step to bringing a discrimination claim under the TCHRA. Failure to demonstrate those elements means the plaintiff never gets the presumption of discrimination and never proves his claim. . . . [T]hat failure also means the court has no jurisdiction and the claims should be dismissed.

*Id.* (quotations omitted). This does not require a plaintiff to "marshal evidence" and prove the claim to satisfy the jurisdictional hurdle. *Id.* Rather, a plaintiff need only submit evidence in support of the prima facie claim if the defendant presents evidence negating one or more of the

elements of the claim. *Id.* Even then, the plaintiff's burden is only to provide some evidence of the challenged elements. *Id.*

Accordingly, when a suit alleging claims under the TCHRA is brought against a governmental entity, the court must consider the particular facts of the case to determine whether the claims come within the scope of the TCHRA waiver of immunity. *Tex. Dep't of Crim. Justice v. Cooke*, 149 S.W.3d 700, 704 (Tex. App.—Austin 2004, no pet.) (citing *Tex. Dep't of Crim. Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001)). A conclusory allegation in the petition that the governmental entity has violated the TCHRA is insufficient. *See Lueck*, 290 S.W.3d at 884. Thus, in this case, the question of whether the SOAH has waived immunity turns on whether the former judges pled and provided the trial court with some evidence of their claims under the TCHRA with regard to the elements of the claims challenged by the SOAH in its pleas to the jurisdiction. *See Garcia*, 372 S.W.3d at 636. The SOAH contends the former judges failed with regard to certain elements of their claims, therefore, immunity was not waived, and the trial court lacked subject matter jurisdiction, requiring the trial court to grant their pleas to the jurisdiction.

The TCHRA prohibits an employer from discriminating against an individual with respect to compensation, or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, and national origin. TEX. LAB. CODE ANN. § 21.051. Thus, to maintain an action under the TCHRA, the plaintiff must make a prima facie showing that: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; and (3) non–protected employees were not treated similarly. *McCoy v. Tex. Instruments, Inc.*, 183 S.W.3d 548, 554 (Tex. App.—Dallas 2006, no pet.) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792–93 (1973)). The TCHRA also makes it unlawful for an employer to retaliate against an employee who opposes a discriminatory practice or makes or files a complaint. TEX. LAB. CODE ANN. § 21.055. Under section 21.055, the employee–plaintiff must show: (1) he or she engaged

in a protected activity; (2) the employer took an adverse employment action against the employee; and (3) the employer took the adverse action based on the employee's engagement in the protected activity. *McCoy*, 183 S.W.3d at 555. Subjective beliefs of discrimination alone are insufficient to establish a prima facie case *Id.*; *see also Chandler v. CSC Applied Techs., LLC*, 376 S.W.3d 802, 814 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

### *Application*

In this appeal, the SOAH contends the former judges failed to provide some evidence with regard to certain elements of their TCHRA claims and therefore, immunity was not waived, requiring the trial court to grant the plea to the jurisdiction. We separately consider each of the former judges' claims and the plea to the jurisdiction relating thereto.

### 1. *Landeros*

Landeros began working at the SOAH in 1995 and was ultimately promoted to Master ALJ in 2006. According to her petition, in September 2008, Landeros and Utilities Team Leader/ALJ Lilo Pomerleau had a disagreement regarding Landeros's refusal to take on cases relating to the Public Utilities Commission ("PUC"). Pomerleau claimed Landeros refused because she did not want to work on PUC cases. However, Landeros asserted she refused "because she was fully engaged in licensing cases that required her attention." According to Landeros, Pomerleau threatened her, stating Landeros's position as a Master ALJ "could be dependent on her cooperation" with Pomerleau. Landeros still refused to take on any PUC cases. Landeros alleged she requested a meeting with the Chief ALJ Cathleen Parsley, but received no response.

According to Landeros, on September 10, 2008, she was called to a meeting with Chief ALJ Parsley and two others. Landeros claimed the focus of the meeting was to discuss Landeros's alleged lack of civility in the office and her refusal to cooperate with Pomerleau. Chief ALJ Parsley told Landeros she intended to prepare a memorandum about the meeting and place it in

the chief's personal file and in Landeros's Human Resources file, but did not intend to place it in Landeros's permanent personnel file unless there were further incidents.

Landeros claimed that after the meeting, she realized that SOAH management "was not going to control Lilo Pomerleau's aggression toward her." Considering Pomerleau's behavior and the meeting with the Chief ALJ, Landeros decided "continued employment in the agency's toxic environment was intolerable for her, and any other reasonable person." Thereafter, on November 3, 2008, Landeros resigned her position as Master ALJ. In her petition, she claimed she was "constructively discharged" because she opposed discriminatory practices within the SOAH, including age and gender discrimination–specifically management and team leaders favoring younger, male ALJs, rewarding them with better pay and better assignments. Landeros asserted she was retaliated against for her opposition to the alleged discriminatory practices.

In its plea to the jurisdiction and on appeal, the SOAH contends that as a matter of law Landeros was not constructively discharged, and therefore, she did not suffer an adverse employment action, a requirement to maintain a suit under either section 21.051 or section 21.055 of the THCRA. *See Chandler*, 376 S.W.3d at 814 (holding that to establish prima facie case of discrimination, plaintiff must show adverse employment action); *McCoy*, 183 S.W.3d at 554 (same). Accordingly, the SOAH argues immunity has not been waived and the trial court lacks jurisdiction over her claims.

The SOAH presented evidence that Landeros resigned, and there were no conditions present at the SOAH that would have compelled her resignation. More specifically, the SOAH presented evidence showing Landeros was considered one of the best ALJs, was well–paid compared to other ALJs, and had in fact received a merit bonus shortly before she resigned. There was also evidence that conditions for Landeros were no different than those for other ALJs. Thus,

Landeros was required to present more than a scintilla of evidence regarding her claim of constructive discharge. *See Miranda*, 133 S.W.3d at 228.

When an employee submits a letter of resignation, she may still satisfy the adverse employment action element by proving that she was constructively discharged. *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (citing *Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)); *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 575 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see generally City of Austin Police Dep't v. Brown*, 96 S.W.3d 588, 595 (Tex. App.—Austin 2002, pet. dism'd) (holding courts look to pertinent federal decisions to resolve discrimination claims under TCHRA because act is patterned after Title VII of federal Civil Rights Act). The Texas Supreme Court has held that a constructive discharge qualifies as an adverse employment action when an employer makes conditions "so intolerable that a reasonable person would feel compelled to resign." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 805 (Tex. 2010); *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174, 177 (Tex. App.—Houston [14th Dist.] 1991, no writ). When determining whether an employee acted reasonably, we must look at the facts of each case. *Barrow,* 10 F.3d at 297. However, the Fifth Circuit has provided factors for courts to consider, singly or in combination, in deciding whether the employee acted reasonably in resigning. *Id.*; *Winters*, 132 S.W.3d at 575. These factors include: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities, (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not. *Barrow,* 10 F.3d at 297.

With regard to these factors, there is no evidence Landeros was demoted, her salary was reduced,[5] her responsibilities were reduced, she was reassigned to menial work, she was forced to work under a younger supervisor, or was offered an unfair early retirement. Accordingly, the only possible factor Landeros's evidence might be addressed to is the sixth one – badgering, harassment, or humiliation calculated to encourage resignation. However, we hold the evidence produced by Landeros in an effort to establish constructive discharge is not evidence of behavior by the SOAH through its management or employees that was so harassing or humiliating that a reasonable person would have felt compelled to resign or that such behavior was undertaken in a calculated effort to cause Landeros to resign.

Landeros points to her own testimony and that of Michael Borkland, a former SOAH ALJ and "Assistant Director of the Administrative License Division." Both Landeros and Borkland testified, for the most part, about the behavior of Lilo Pomerleau and Chief ALJ Parsley. According to Borkland's affidavit, Pomerleau told the former Chief ALJ people were afraid to talk to him, which the former Chief ALJ did not believe. He stated Pomerleau wanted to demote Landeros as early as 2007, but it is undisputed this never occurred. Borkland stated that when Parsley was appointed Chief ALJ, his first meeting with her "did not go well." According to Borkland, Parsley told him that if he was unable to get along with Pomerleau, "she would do something about it." He then criticized Pomerleau, calling her "poison."

Borkland also addressed the dispute between Landeros and Pomerleau regarding the PUC cases. Borkland said that when he sided with Landeros, Pomerleau "slammed" his door. When these events were reported to the General Counsel, Kerry Sullivan, he "laughed it off." When he was later questioned about the dispute between Landeros and Pomerleau, he advised that no blame

---

[5] In fact, the record shows that at the time of her resignation, Landeros was making approximately $106,000.00 per year, making her one of the highest paid ALJs, and she had recently been awarded a bonus of $5,000.00.

should be placed on Landeros. Borkland also testified about the meeting between Landeros and Chief ALJ Parsley, pointing out that Parsley told Landeros she "would rather have a colonoscopy than talk to you." In sum, Borkland said he resigned his management position in 2008, and ultimately left the SOAH in 2010, when it became clear Pomerleau would be allowed "to run loose," making him feel as if he would be fired.

Reviewing Borkland's testimony, we hold it does not constitute a scintilla of evidence of behavior so badgering, harassing, or humiliating that it would compel a reasonable person to resign. Clearly, there was dysfunction in the office of the SOAH and certain people disliked each other and were unable to get along. This is likely true in any large office. However, most of Borkland's affidavit relates to his subjective beliefs about one employee's boorish behavior, and his feelings about what might happen in the future if it was allowed to continue. Moreover, there is no objective evidence in the record to show that any of the actions taken by Pomerleau, Sullivan, or by Chief ALJ Parsley were calculated to cause Borkland or Landeros to resign. *See Dillard Dep't Stores v. Gonzales*, 72 S.W.3d 398, 409 (Tex. App.—El Paso 2002, pet. denied) (holding conditions of work environment determine whether reasonable person compelled to resign, not employer's state of mind). Thus, if there is any evidence of a constructive discharge, we must look to the evidence provided by Landeros herself.

Just as with Borkland, Landeros's evidence regarding the alleged intolerable working conditions at the SOAH focus on her interactions with Pomerleau and the actions of Chief ALJ Parsley relating to those interactions (and with regard to Landeros's interactions with others). Taking the evidence as true, Pomerleau attempted to undermine Landeros and have her demoted – which never happened. In fact, as noted above, Landeros received a merit bonus, and the General Counsel described her as one of the most productive ALJs in the SOAH. The General Counsel described her response to Pomerleau as merely terse, but not unprofessional.

Landeros specifically points to Pomerleau's demand that she work on PUC cases at a time when Landeros had a full docket, and Pomerleau's subsequent report of the incident to Chief ALJ Parsley. This resulted in a meeting between Landeros, the Chief ALJ, Borkland, and the Human Resources director. The result of that meeting was a memorandum from the Chief ALJ to Landeros entitled "Memorandum of September 10, 2008, Oral Counseling and Conference." In that memorandum, the Chief ALJ recognized Landeros's problem with Pomerleau and acknowledged Landeros claimed to feel threatened and targeted. The memorandum, which was never placed in Landeros's personnel file, counseled Landeros that as a Master ALJ, she was required to accept all assignments as needed, even those she would prefer not to accept. The memorandum advised Landeros of the expectation that she be cooperative and civil with all co-workers. The memorandum also described the lengths to which the Chief ALJ had gone to accommodate Landeros with respect to interactions with the staff, including staff other than Pomerleau. The memorandum makes it clear Landeros had issues with staff other than Pomerleau.[6] Other than the memorandum, Landeros suffered no adverse action as a result of the meeting.

As with Borkland, we hold Landeros's testimony regarding Pomerleau's behavior is no evidence of a workplace so humiliating and harassing that it compelled Landeros to resign. *Barrow*, 10 F.3d at 297. Nor do Chief ALJ Parsley's actions rise to such a level. Rather, the Chief ALJ's actions appear to be a routine counseling session with an employee – critical, yes, but done in an effort to compel resignation? The evidence simply does not support this.

Texas courts recognize an employer must be able to criticize an employee's work actions without fear it will be used as evidence of constructive discharge. *Wal–Mart Stores, Inc. v. Bertrand*, 37 S.W.3d 1, 9 (Tex. App.—Tyler 2000, pet. denied). Employers must be free to

---

[6] In her deposition, one of the former judges in this appeal, Carol Birch, described Landeros as "less than friendly at times."

supervise, review, and even criticize employees to ensure the organization performs properly.  *Id.* (quoting *Johnson v. Merrell Dow Pharms., Inc.*, 965 F.2d 31, 34 (5th Cir. 1992)).  In addition, unfavorable work evaluations – the Chief ALJ's comments regarding Landeros's need to be civil and cooperative with co-workers – will not support a constructive discharge claim.  *See Hammond*, 821 S.W.2d at 178.  That an employee views the criticisms or evaluations as unjustified or wrong does not permit us to find evidence of constructive discharge.  *Bertrand*, 37 S.W.3d at 8.

We hold Chief ALJ Parsley's actions amount to a review and criticism – an evaluation – of Landeros's work at the SOAH.  Chief ALJ Parsley recognized and commented on Landeros's interactions with Pomerleau and others, counseling Landeros to modify her behavior.  That the Chief ALJ believed one employee's statements over another's is not supportive of a claim for constructive discharge.  If so, employers would be subject to a constructive discharge claim each time there was a dispute between two or more employees – by necessity having to accept one version of events over another.

Moreover, general allegations of harassment, without more, are insufficient to raise a fact issue as to whether a working environment was so intolerable that a reasonable person would feel compelled to resign.  *Gonzales*, 72 S.W.3d at 409.  In fact, "constructive discharge must be based upon harassment of a greater severity or pervasiveness than the minimum required to prove a hostile work environment."  *Id.*  All of Borkland's and Landeros's testimony about the intolerable conditions at the SOAH that compelled them to resign focus on the behavior of a single person, Pomerleau, and the Chief ALJ's refusal to control her.  Specifically, Landeros claimed that working with or under Pomerleau, a person she described as having marginal competence and questionable ethics, was intolerable.  She also stated Chief ALJ Parsley failed to put a stop to Pomerleau's disruptive behavior.  We hold these amount to, at best, general allegations of harassment, which are insufficient to support a claim of constructive discharge.  *See id.*

Importantly, there is nothing to suggest a calculated effort by anyone at the SOAH to engage in behavior so as to compel or force Landeros to resign. *See Bertrand*, 37 S.W.3d at 8 (holding that in constructive discharge context, employer's actions must have been taken with intention of forcing employee to quit). Clearly, there is evidence of discord between Landeros and Pomerleau – as well as between Landeros and others – but Pomerleau's behavior, taken as true, does not suggest it was undertaken in an effort to force Landeros to resign. Admittedly, Borkland testified that in 2007, under another Chief ALJ, Pomerleau proposed an attempt to demote Landeros. But there is nothing in the record to show Pomerleau could have demoted Landeros, or that Pomerleau took any action in this regard other than proposing it at a single meeting more than a year before Landeros resigned. There is no evidence Landeros even knew about the proposal.

Based on the applicable standard of review, the evidence in the record, and our analysis of the law, we hold there is no evidence Landeros was constructively discharged. There is no evidence the actions of anyone at the SOAH badgered, harassed, and humiliated Landeros to such a degree that a reasonable person in her position would have felt they had no option but to resign. Because Landeros failed to submit even a scintilla of evidence in support of the element of constructive discharge, immunity was not waived and the trial court lacked subject matter jurisdiction over her claims. *See Garcia*, 372 S.W.3d at 636. Accordingly, the trial court erred in denying the SOAH's plea to the jurisdiction as to Landeros.

## 2. *<u>Homer</u>*

Homer began working as an ALJ at the SOAH in 2004. Although Homer submitted a letter of resignation on September 1, 2008, he does not contend he was constructively discharged. Rather, he claims he was actually terminated on September 23, 2008. Homer claims his termination was motivated by age discrimination – he turned sixty-six the day after the alleged termination. He also asserts his termination was in retaliation for speaking out about the disparate

treatment received by younger, male ALJs. Like Landeros, Homer focused on Lilo Pomerleau, claiming she had a preference for "the boys," flirting with them and favoring them over other ALJs.

In the petition, Homer contends he observed a preference at the SOAH for younger ALJs, manifested by better pay and work assignments. He also observed a pattern of management "leaning on ALJs" to rule in favor of state agencies in litigation before the SOAH – something older ALJs resisted, but younger ALJs seemed amenable. This resulted in extreme pressure and a negative impact on the working conditions of the older ALJs. He specifically claims that beginning in 2005, management no longer assigned him complex cases, which affected his prospects for promotion and increased pay. He noted a "cessation in praise" for his work, while a significantly younger co–worker, who was hired only four months before Homer, received "highest praise." Homer contends he was denied merit raises or bonuses in 2006–2008, but younger ALJs received them. He asserts that when he was fired, he was the "lowest–paid ALJ in the Austin SOAH office," despite having handled numerous complex cases and assisting the SOAH in other ways.

In July 2008, Homer sent an e–mail to the incoming Chief ALJ, Cathy Parsley. Homer claims the e–mail was sent to welcome her and advise her about the on–going gender and age discrimination issues at the SOAH, citing statistics from 2001–02. Although he failed to mention it in the petition, he began his "welcoming" e–mail by noting his "dismay" at hearing Parsley did not intend to make changes and needed to hear only from team leaders as opposed to the "working ALJs." Additionally, the e–mail contained the following statement: "If you don't stand up to the status quo, SOAH will continue running as it always has, on hard work, conspiracy, Effexor,[7] and the tears of middle–aged women." Homer refers to this as "unfortunately colorful language," but

---

[7] Effexor is an anti–depressant used to treat major depressive disorders, anxiety, and panic disorder. DRUGS.COM, http://www.drugs.com/effexor.html (last visited July 15, 2013).

Chief ALJ Parsley advised Homer in a responsive e–mail that although she would "chalk it up," she found the references to "middle–aged women" and "Effexor" "offensive" and "inappropriate." She advised that such comments had no place in the SOAH. Chief ALJ Parsley also told Homer he was welcome to discuss his concerns with her any time.

Homer claims that after this, it became clear he was suffering retaliation for his opposition to discriminatory practices, receiving no bonus in 2008 and being "placed on probation or something like it for failing to timely turn in all PFDs." Thereafter, on September 1, 2008, Homer sent an e–mail to Chief ALJ Parsley that states: "This is to give notice that I will retire from the SOAH, effective October 31, 2008."

On September 23, 2008, Homer left the office early for a personal matter, stating he had completed his work and received permission to leave from the ALJ in charge of the current project. According to Homer, while he was in his vehicle, he received a call from General Counsel Kerry Sullivan advising him that he was terminated for leaving the office without completing an assignment.[8] He was subsequently "granted retirement" effective September 30, 2008. At his deposition, Homer testified there was no negotiation regarding the new retirement date. Rather, he stated he was told he "was going to be fired" and he asked to remain on the payroll until the end of the month.

In its plea to the jurisdiction and on appeal, the SOAH contends, among other things, that as a matter of law Homer has failed to provide prima facie proof that he suffered an adverse employment action, a requirement to maintain a suit under either section 21.051 or section 21.055 of the THCRA. *See Chandler*, 376 S.W.3d at 814 (holding that to establish prima facie case of

---

[8] This version of events was disputed by the SOAH. The SOAH claimed there were reports of Homer leaving the office without completing his assignment. An e–mail from the General Counsel to Homer implies the parties negotiated an accelerated retirement date of September 30, 2008, with Homer using vacation time from September 23, 2008, until retirement.

discrimination, plaintiff must show adverse employment action); *McCoy*, 183 S.W.3d at 554 (same). Accordingly, the SOAH argues immunity has not been waived and the trial court lacks jurisdiction over his claims.

The SOAH produced evidence that Homer sent an e–mail on September 1, 2008, stating he was retiring effective October 31, 2008.[9] That date was accelerated, for disputed reasons, to September 30, 2008. The SOAH asserts that once Homer resigned, he was no longer legally entitled to control the actual date his employment would end, and therefore suffered no adverse employment event.

The issue is whether an employee can claim an adverse employment event when he resigns effective at some future date, but the employer declines and requires the employee to leave immediately or before the date asserted by the employee in the resignation notice. The Federal District Court for the Southern District of Texas was presented with this issue in 2007. In *E.E.O.C. v. J.H. Walker, Inc.*, an employee claimed she suffered an adverse employment event for purposes of a retaliation claim. Civ. A. No. H–05–2232, 2007 WL 172626, at \*20–\*22 (S.D. Tex. Jan. 18, 2007).[10]

In *J.H. Walker*, an employee claimed she was fired in retaliation for opposing gender–based discrimination. *Id.* at \*21. The employer claimed, among other things, that the employee did not suffer an adverse employment event because she resigned. *Id.* at \*22. The employee countered that she suffered an adverse event because when she resigned, she stated the effective

---

[9] Homer specifically stated at the hearing on the plea to the jurisdiction, and asserts in his brief to this court, that he is not claiming constructive termination. Rather, he claims he was terminated on September 23, 2008, and he was terminated based on age discrimination and in retaliation for his opposition to the alleged discriminatory practices at the SOAH.

[10] Under the Federal Rules of Appellate Procedure, "[a] court may not prohibit or restrict the citation of federal judicial opinions, orders, or judgments, or other written dispositions that have been" issued after January 1, 2007, and designated as "'unpublished,' 'not for publication,' 'non-precedential,' 'not precedent,' or the like.'" FED. R. APP. P. 32.1(a).

date of her resignation was two weeks from the date of her resignation notice, but the employer decided her resignation would be effective immediately. *Id.* The federal district court noted the employee had failed to cite any authority for the proposition that she was fired and thereby suffered an adverse employment action when the employer accepted her resignation immediately rather than allowing her to work an additional two weeks. *Id.* The court then noted that several cases had reached the opposite result. *Id.*

For example, in *Leyva v. Computer Sciences Corp.*, the court held that "[a]n employer's decision to accept a resignation immediately, rather than accepting an employee's request that the resignation be effective at a future date, does not constitute an adverse employment action." Civ. A. No. 04–002–KAJ, 2005 WL 196557, at *5 (D. Del. Jan. 25, 2005), *aff'd*, 169 Fed. Appx. 720 (3d Cir. 2006). The court explained the employee was "an at–will employee" who had "no right to resign and then demand her own chosen termination date." *Id.* In reaching this decision, the federal district court relied on *Wynn v. Paragon Sys., Inc.*, 301 F. Supp. 2d 1343, 1354 (S.D. Ga. 2004). In *Wynn*, the court noted that firing an employee is obviously an adverse employment event, but the employee had voluntarily terminated the employment relationship, giving two weeks notice. *Id.* at 1354. That the employer chose to reject the offer to work an additional two weeks did not constitute an adverse employment event. *Id.*

We have discovered several federal appellate court decisions with regard to the voluntary resignation/adverse employment event issue. In *Mattern v. Eastman Kodak Co.*, the Fifth Circuit held an employee who resigned had not suffered an adverse employment event because *prior to* her resignation, there had been no ultimate employment decision. 104 F.3d 702, 709 (5th Cir. 1997), *abrogated on other grounds by Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006) (emphasis added). Ultimate employment decisions include such acts as "hiring, granting leave, discharging, promoting, and compensating," and only ultimate employment decisions

- 20 -

satisfy the adverse employment action element. *Id.* at 707; *see Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 769 (5th Cir. 2001). The court held the employee had "preempted a possible ultimate employment decision–she resigned." *Mattern*, 104 F.3d at 709. Here, there is no evidence of an ultimate employment decision *prior to* Homer's notice of retirement and therefore, we hold as a matter of law he could not have suffered an adverse employment action. *See id.*

Similarly, in *Hammon v. DHL Airways, Inc.*, a DHL pilot resigned after he became anxious and nervous following a training supervisor's reprimand. 165 F.3d 441, 446 (6th Cir. 1999). Thereafter, the pilot asked DHL to reconsider his "verbal resignation under duress," but DHL refused to reinstate the pilot. *Id.* at 446–47. The pilot sought relief under the Americans With Disabilities Act, which also requires the showing of an adverse employment action, and other federal statutes. *Id.* at 447. The district court granted DHL's motion for summary judgment, finding the pilot had failed to show he had suffered an adverse employment action. *Id.* at 449–50. On appeal, the Sixth Circuit agreed, holding that because the pilot voluntarily resigned, he did not suffer an adverse employment action. *Id.* at 450. Again, there is no dispute Homer voluntarily retired. Although he desired a different effective date than that ultimately chosen by the SOAH, Homer still voluntarily retired prior to any alleged adverse employment action.

We find the authorities cited above, both from the federal district and appellate courts, persuasive. It is undisputed that on September 1, 2008, Homer announced his retirement effective October 31, 2008. We hold the SOAH's decision to accelerate the effective date by thirty days, which occurred after the notice of retirement, did not constitute an adverse employment action – Homer's decision to retire was voluntary. Homer presented no evidence that the earlier retirement date resulted in adverse consequences with regard to his retirement.

Accordingly, we hold the trial court erred in denying the SOAH's plea to the jurisdiction as to those claims asserted by Homer. As a matter of law, Homer did not suffer an adverse

employment event, and therefore has failed to provide prima facie evidence of an element of his discrimination and retaliation claims. In the absence of proof of an element of his claims, immunity was not waived and the trial court lacked subject matter jurisdiction over Homer's claims. *See Garcia*, 372 S.W.3d at 636.

### 3. *Wood*

In 1995, Wood began working as an ALJ at the SOAH. Wood had reached the level of ALJ III in 2004, but that year she was demoted to ALJ II and placed on probation for six months. According to the SOAH, and this is undisputed by Wood, the reason for the demotion was a failure to timely manage her docket and timely complete her assigned PFDs. Wood successfully completed her probation, and in 2006 she regained her ALJ III status. In 2007, she was appointed to Master ALJ.

In 2007, Wood was assigned what the SOAH deemed a "major case," *TCEQ v. Envirosol*. It was complex case. What took place with regard to Wood's performance with regard to this case is disputed.[11] According to the SOAH's evidence, the record in Envirosol closed on December 17, 2007. Accordingly, the *Envirosol* PFD was due February 15, 2008, sixty days after the record closed. However, the SOAH presented evidence that Wood did not even begin work on the matter,

---

[11] We note that in her response to the SOAH's plea to the jurisdiction, Wood objected to the affidavits submitted by the SOAH in support of its plea. In fact, Wood and the other former judges objected to much of the SOAH's evidence. However, the former judges failed to obtain a ruling on any of their objections. Obviously, substantive defects to evidence in support of a plea can be raised for the first time on appeal and are not waived by the failure to obtain a ruling from the trial court. *Olivares v. Brown & Gay Eng'g, Inc.*, No. 14–12–00198–CV, 2013 WL 1775998, *6 n.7 (Tex. App.—Houston [14th Dist.] Apr. 25, 2013, no pet.). However, on appeal, none of the former judges raise a cross–point concerning the alleged substantive defects, nor do they in any way brief the issue for this court – they provide no argument or citation to authority. In fact, the only reference in the brief to the objections is a statement that objections were filed and are "adopted by reference." Accordingly, the former judges' objections to any alleged substantive defects in the SOAH's evidence have been waived and will not be considered by this court; we will consider the SOAH's evidence in its entirety. *See Balistreri–Amrhein v. AHI*, No. 05–09–01377–CV, 2012 WL 3100775, at * 1 (Tex. App.—Dallas July 31, 2012, pet. denied) (mem. op.) (holding failure to brief complaint adequately waives issue on appeal); *Taylor v. Meador*, 326 S.W.3d 682, 684 (Tex. App.—El Paso 2010, no pet.) (same); *see also* TEX. R. APP. P. 38.1(i) (stating brief must contain clear and concise argument for contentions made with appropriate citations to record and authorities).

which she agreed would require a fifty to eighty page PFD, until February 11, 2008, four days before the PFD was due. The SOAH asserts Wood did not notify her team leader in advance that she would not be able to meet the February 15 deadline, as required by SOAH policy.

In April 2008, Wood determined the briefing was inadequate and reopened the matter for additional oral briefing, which eventually took place on July 31, 2008. According to the SOAH, after the oral briefing, the record should have been closed, making the PFD due September 29, 2008. It is undisputed Wood took a month–long vacation to Spain in September 2008. SOAH presented evidence Wood still had not discussed the extended process with her team leader – a violation of policy. The team leader only learned about the delay when he received a call from one of the partiesin October of 2008 to ask when a ruling could be expected. The PFD finally issued on December 17, 2008. The SOAH evidence claimed the PFD was, at a minimum, seventy–nine days late. When the PFD issued, it stated "the record was held open until October 1, 2008." The SOAH claims this was a false statement because Wood never requested additional filings from the parties and the parties never requested the record be held open after July 31, 2008.

According to the SOAH evidence, Wood's performance on the important *Envirosol* matter was an unacceptable recurrence of her 2004 performance problems, enhanced by Wood's failure to report the continuing delays to her team leader as required by SOAH policy, as well as her misstatement in the PFD, which the SOAH considered an attempt to falsify deadlines to avoid censure. The SOAH presented evidence that Wood's performance on the *Envirosol* matter, coupled with her prior time management issues, forced them to terminate Wood. Wood resigned in lieu of termination in November 2008.

Wood contends things were more complicated than stated by the SOAH. She testified the *Envirosol* matter involved numerous hearings and reopening of the record. She also notes her first draft PFD was rejected by the team leader, further delaying completion of the PFD, which was

seventy–eight pages long. Wood also points out that during the relevant time period, she also worked on "other large, complex cases." She concedes she held the record open beyond the July 31, 2008 hearing, but alleges this was not a valid basis for her termination because the parties were aware of her ruling and there was no protest from, or prejudice to, the parties. Wood contends she was terminated based on her age and gender, as well as in retaliation for her opposition to disparate pay for older, female ALJs and because she verbally protested failure to promote three other female ALJs. Wood contends the SOAH's reasons for her termination were "false and pretextual."

In its plea to the jurisdiction and on appeal, the SOAH contends it established Wood was terminated not for discriminatory reasons, but because of the recurring mismanagement of her docket, her violations of SOAH policy regarding reporting, and the misstatement regarding the closing date in the *Envirosol* PFD. The SOAH argues Wood cannot show others similarly situated were treated more favorably, an element of a claim under section 21.051. *See* TEX. LAB. CODE ANN. § 21.051. We find SOAH presented evidence to establish a non–discriminatory reason for the termination, shifting the burden to Wood to raise more than a scintilla of evidence establishing she was terminated based on age or gender. *See Miranda*, 133 S.W.3d at 228.

With regard to Wood's retaliation claim, the SOAH again points to the evidence that Wood was fired for legitimate, non–discriminatory reasons. The SOAH contends Wood cannot establish she was terminated for engaging in protected activity, a requirement under section 21.055 of the Labor Code. *See* TEX. LAB. CODE ANN. § 21.055. As we stated, the SOAH presented evidence establishing legitimate reasons for Wood's termination. Therefore, with regard to retaliation, Woods had to produce more than a scintilla of evidence that she engaged in a protected activity and was terminated because of such activity. *See Miranda*, 133 S.W.3d at 228.

With regard to her discrimination claims based on gender and age, Wood had to provide more than a scintilla of evidence that others who were similarly situated, but not in the same gender

or age class as Wood, were treated more favorably. *See* TEX. LAB. CODE ANN. § 21.051. In an employment discrimination context, employees are "similarly situated" if "their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (citing numerous federal appellate court decisions).

In an effort to meet this burden, Wood could rely upon direct or circumstantial evidence, or both. *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005); *Acker v. Deboer, Inc.*, 429 F. Supp. 2d 828, 837 (N.D. Tex. 2006). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones*, 427 F.3d at 992. When a person with decision–making authority exhibits discriminatory animus, it may constitute direct evidence of discrimination. *Id.* However, a discriminatory comment or remark is not direct evidence of discrimination unless it is: (1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the adverse employment action; (3) made by a person with authority over the adverse employment action; and (4) related to the employment decision at issue. *Auguster v. Vermillion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001). Remarks that do not meet this four–part test are considered "stray" remarks and are not direct evidence of discrimination. *See id.*

Evidence is circumstantial if it requires the court "to make too many inferences in order to determine that the evidence demonstrated discrimination." *Jones*, 427 F.3d at 992. Circumstantial evidence may come in the form of a comparison with other similar situated employees. *See Cherry v. CCAP Props. of Am., Ltd.*, 438 Fed. Appx. 348, 351 (5th Cir. 2011). However, an employee who proffers a fellow employee as a "comparator" must demonstrate the employment actions were taken "under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009). In determining whether a proposed comparator's actions occurred "under nearly

identical circumstances," courts consider a number of factors, including whether the employer and the comparator: (1) held the same job or responsibilities, (2) shared the same supervisor or had their employment status determined by the same person, and (3) have essentially comparable violation histories. *Id.* However, it is critical that the plaintiff's conduct that drew the adverse employment action be "nearly identical to that of the proffered comparator who allegedly drew" a dissimilar response. *Id.* Of all of these factors, the most important is the similarity of the comparator's conduct to that which led to the plaintiff's termination. *See id.* As stated by the Fifth Circuit, "[i]f the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer,' the employees are not similarly situated." *Id.* (quoting *Wallace v. Methodist Hosp. Sys., Inc.*, 271 F.3d 212, 221–22 (5th Cir. 2001)).

We have reviewed Wood's evidence and hold there is no direct evidence of discrimination. However, Wood did present circumstantial evidence in support of her discrimination claims. The question is whether the evidence relied upon by Wood is more than a scintilla of evidence that she was treated differently because of her age and/or gender than others who were similarly situated, i.e., those who were required to adhere to similar standards, had the same supervisors, and engaged in the same type of work. *Monarrez*, 177 S.W.3d at 917.

First, Wood presented evidence of numerous comparators in an effort to show she, and other ALJs, were treated differently than ALJs who were male, younger, or both. Wood argues many of the comparators either had numerous untimely PFDs, PFDs that were turned in significantly later than her *Envirosol* PFD, or both. However, none of these comparators were terminated. Wood refers to numerous ALJs she alleges were comparable but not terminated, including: Roshunda Atchisom, Michael Borkland, Stephen Burger, Henry Card, Cassandra Church, Cathy Egan, Kyle Groves, Wendy Hendricks, Brenda Coleman, John Beeler, Timothy

Horan, Paul Keeper, Leslie Craven, Suzanne Marshall, Stephen Pacey, Gary Elkins, General Counsel Kerry Sullivan, and even Charles Homer – who claimed he was terminated for leaving the building without permission, not for untimely PFDs.

We accept as true Wood's claim that the comparators had untimely PFDs and were not disciplined. However, therein lies the problem. Even if these comparators held the same job or responsibilities (all ALJs), shared the same supervisor or had their employment status determined by the same person (Chief ALJ Parsley), and had essentially comparable violation histories (untimely PFDs), we hold there is no evidence their conduct was "nearly identical" to that for which Wood was terminated. *See Lee*, 574 F.3d at 260. As noted above, the most critical factor in evaluating comparator evidence is that the plaintiff's conduct that drew the adverse employment action be "*nearly identical* to that of the proffered comparator who allegedly drew" a dissimilar response. *Id.* (emphasis added). Taking Wood's evidence as true, we agree all of the proffered comparators had late PFDs – many of them had several late PFDs. However, Wood was not terminated solely because she filed the *Envirosol* PFD in an untimely matter. Rather, the evidence, which is undisputed, establishes Wood's termination was based, in part, on her prior demotion and probation, which was also for time mismanagement, and because she misrepresented the closing date in the *Envirosol* PFD. In addition, she failed to comply with the SOAH policy that required her to contact her supervisor if she believed a PFD would not be timely completed. Wood presented no evidence the other comparators had prior disciplinary actions for late PFDs and improper time mismanagement, and were demoted and placed on probation for that conduct. Nor did she present any evidence the comparators misrepresented closing dates in their PFDs, or that they failed to advise supervisors when PFDs could not be completed on time. We therefore hold the conduct for which Wood was terminated differed from those she claims were treated differently due to gender and age. *See Hockman v. Westward Comm'ns, LLC*, 282 F.Supp.2d 512, 527–28

(E.D. Tex. 2003) (holding employees with different work rule violations are not considered to be nearly identical).  Accordingly, we do not find Wood's comparator evidence to constitute even a scintilla of evidence that Wood was treated differently from those who were similarly situated.

Second, Wood presented evidence that Chief ALJ Parsley had a preference for younger ALJs.  In her deposition, the Chief ALJ admitted telling a job applicant the SOAH was looking to hire younger judges.  We hold the statement, which we must take as true and from which we must indulge any reasonable inferences in favor of Wood, is not evidence of discrimination based on age.  It does not evince an intent to discriminate.  *See Berquist v. Washington Mut. Bank*, 500 F.3d 344, 351 (5th Cir. 2007) (holding employer's comment that he desired to "attract younger talent," was not evidence of age discrimination); *see also Jones*, 427 F.3d at 992; *Acker*, 429 F. Supp. 2d at 837.  To consider this statement as an acknowledgement of discrimination we would have to infer that Chief ALJ Parsley's desire to hire younger ALJs meant that the chief intended to take adverse employment action against the older ALJs, e.g., terminate them, attempt to force them out, etc.  However, we hold this would not be a reasonable inference, but would be the rankest form of speculation.  Accordingly, we hold this is not even a scintilla of evidence with regard to age discrimination.

Wood also presented circumstantial evidence from others with regard to both age and gender discrimination, i.e., that younger and/or male ALJs were treated differently.  Katherine Smith testified by affidavit that she was an ALJ from 1996 until 2011.  She stated, based on her observation, that the SOAH "practiced a culture of preference for males over females, in spite of the fact that the agency head is a female and significant upper level management responsibilities are held by females."  Smith testified her testimony was based on experience, testifying that Pomerleau "loved the boys," and they were "favorites."  Smith stated Pomerleau, a team leader

who was close to the Chief ALJ, would give these men "great cases to work on" and "go to bat" for them in the event of any disagreement.

Smith testified General Counsel Sullivan permitted team leaders, e.g., Bill Newchurch, to "practice disparate treatment of male over female ALJs." As an example, Smith stated Newchurch was permitted to demote two women in managerial positions, replacing them with men. Smith claimed Sullivan was involved in this repositioning of the staff. Smith also testified team leader Tommy Broyles showed a preference for male ALJs. As an example, Smith stated Broyles "really loved Craig Bennett," going so far as to state he should eventually become the head of the agency.

Smith averred there was also a notable preference for younger ALJs. She stated the older ALJs "were in constant fear." Smith believed she and another older ALJ would have been the next to go, but the filing of the lawsuit by the former judges caused the "overt hostility" the older ALJs had been experiencing to "slack off a bit." She said this allowed her and at least one other ALJ to retire before they were fired.

Homer also presented testimony about the "sexually charged and ageist components" within the SOAH. Homer testified he observed an institutional preference for younger ALJs. Homer stated this preference was manifested by Pomerleau and her interactions with the younger, male ALJs – giving them more favorable work assignments.

Wood provided testimony by deposition. She stated that from 2002–09, Bill Newchurch was her direct supervisor. She claimed they had different ideas about case management, and he often criticized her for reopening cases. Newchurch raised the issue of retirement in 2004, coming into Wood's office and suggesting maybe Wood was "too tired of working." Wood stated she viewed this as a threat, a suggestion that if she did not retire, she would be disciplined. Wood testified that in 2004, she met with Newchurch and Sullivan. She claims that at the meeting she was told she should considering retiring or she would face probation for time management issues

with regard to her work. Wood did not retire and she was ultimately placed on probation and demoted. Wood testified her demotion was based on her age, not her work.

Wood averred her termination, which she asserts was decided by Newchurch, Sullivan, and Chief ALJ Parsley, was based on her age. When asked what made her think age was the deciding factor, Wood relayed that as an older ALJ, she was paid more, had a great deal of vacation time reserved, and she qualified for retirement. Wood referenced an incident that took place in the summer before her termination in which Newchurch spoke to her about the "wonderful batch of applicants" the SOAH had received – people who were "so young" and "energetic."

Wood stated the organizational structure of the SOAH allowed discrimination. Managers would assign the better cases to the younger ALJs, most often the men, instead of Wood or other older, female ALJs. She said this practice was not limited to her team, but was taking place throughout the SOAH. Wood testified she could see the discrimination by seeing each week who was assigned the better cases – the important, news-worthy cases. Wood stated she went nine months without receiving a complex case.

Taking the evidence provided by Smith, Homer, and Wood as true, and indulging all reasonable inferences from that evidence in favor of Wood, we hold Wood presented more than a scintilla of evidence that she was treated differently because of her age and gender than other ALJs who were similarly situated, but younger, male, or both. The evidence is slight, but this is all that is required considering the posture of this case, i.e., a plea to the jurisdiction. Accordingly, we hold the trial court did not err in denying the SOAH's plea to the jurisdiction with regard to Wood's claims under section 21.051 of the TCHRA.

In addition to her discrimination claims, Wood asserted a retaliation claim under section 21.055 of the TCHRA, claiming she was terminated, at least in part, for engaging in protected activity. Specifically, for complaining about the SOAH's seeming disparate treatment of older,

female ALJs. The SOAH asserts Wood presented no evidence that she engaged in any protected activity, or that this resulted in her termination.

Protected activities under section 21.055 include: (1) opposing a discriminatory practice; (2) making or filing a charge; (3) filing a complaint; or (4) testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing. *City of Waco v. Lopez*, 259 S.W.3d 147, 150 (Tex. 2008). Wood testified in her deposition that she complained about the SOAH's failure to promote Katherine Smith, an older, female ALJ. Wood complained to several people about this, including Chief ALJ Parsley, who at the time of the complaint was general counsel for the SOAH. She also complained about the failure to promote Cathy Egan and Carol Birch. This complaint was also made to Parsley in her capacity as general counsel. Wood testified these reports caused her to become known as a "dissenter." Others at the SOAH would come to her and tell her they had been warned not to talk to her because she was vocal about the lack of promotions of older, female ALJs. She averred she had an open reputation for complaining about discrimination against women, particularly older women, which placed her in a less favorable position with reference to maintaining her job. Wood specifically testified her complaints were "partial motivation" for her termination. Wood points to warnings from her supervisor, Newchurch, to be careful because her complaints were not looked upon favorably.

Obviously, complaining about discriminatory behavior and reporting it to the general counsel constitutes protected activity. *See id.* However, that activity must form, at least in part, the basis for the employer's adverse employment action. *McCoy*, 183 S.W.3d at 554; *see* TEX. LAB. CODE ANN. § 21.055; *see also Johnson v. City of Houston*, 203 S.W.3d 7, 11 (Tex. App.— Houston [14th Dist.] 2006, pet. denied) (holding plaintiff need not prove her protected activity was only factor motivating employer's decision).

The only evidence in the record as to whether the SOAH's decision to terminate Wood was based on her decision to engage in a protected activity, i.e., complaining about disparate treatment of older, female ALJs, is Wood's testimony. Wood testified she believed her termination was based, in part, on her complaints about disparate treatment. However, as we noted above, subjective beliefs about discrimination alone are insufficient. *See Chandler*, 376 S.W.3d at 814; *McCoy*, 183 S.W.3d at 554. We therefore hold the trial court erred in denying the SOAH's plea as to Wood's retaliation claim because she produced no evidence of a causal link between the protected activity and the adverse employment action.

## 4. *Birch*

Birch began working at the SOAH in 2004. In 2007, she was promoted from ALJ II to ALJ III. She was given several raises during her tenure, but contends she had problems with her team leader, requiring her to go to the former Chief ALJ, Sheila Taylor, to obtain "re–evaluations." According to her petition, Birch was diagnosed with Attention Deficit Disorder ("ADD") in 2006. Birch claimed she kept the diagnosis from the SOAH, and did not request an accommodation based on the disability, fearing she would be stigmatized if her condition were revealed. Birch testified she believed that with medication, no accommodation would be necessary.

According to Birch, in 2008, she began working with Wood on a complicated landfill permit application case. Birch claimed the work on this project was "difficult and draining" and by the time it was over she was exhausted. Birch had other PFDs due at that time, so she was unable "to take a significant break." Birch also claimed that the SOAH's treatment of other older ALJs, including Wood and Homer, contributed to her general feelings of depression and anxiety in the fall of 2008. Birch claimed that by January 2009, she needed to go back to see her doctor. When she did, the doctor prescribed medication for depression and anxiety, and in fact, wanted to

hospitalize Birch because she was suicidal. Birch declined, wanting to complete her pending projects at the SOAH.

On January 7, 2009, Birch received an e–mail from the administrator in charge of docketing, Susan Gage. Gage requested a status report on a number of Birch's cases. Birch admits that at the time she received the e–mail from Gage, she had been told by Wood that Wood had been fired because of several late PFDs. On January 13, 2009, Renee Rusch, Birch's team leader and supervisor, learned about the e–mail from Gage and that Birch had allegedly failed to respond. According to Rusch, Birch advised her that the dates in Gage's e–mail, closing dates and due dates for the PFDs, were incorrect. Rusch claimed Birch told her she did not believe she had any late or overdue PFDs. Rusch claimed she stressed to Birch the need to reveal any problems and avoid a "cover up." A few days later, Birch again claimed Gage's dates were wrong, but admitted she had a single late PFD, but it was only one day late.

Birch's doctor provided a "Physician Request for Accommodation" for Birch dated February 19, 2009. The accommodation stated Birch had been a patient since 2006 and:

> [H]as a diagnosed medical condition that requires extended time to organize and complete assignments. Multiple concomitant assigned projects would require proportionately more time. This accommodation is necessary for this person's optimal performance as well as well being.

Birch provided the accommodation to Rusch on March 3, 2009, at a meeting. According to Birch, Rusch stated she did not believe there would be any problem with the accommodation. Birch claimed the doctor's accommodation merely necessitated more structure and support with regard to Birch's docket and time management, e.g., weekly or bi–weekly meetings with the team leader.

The accommodation was not the only topic of discussion at the meeting. It was at this same meeting, Birch admitted to Rusch that she had missed several PFD deadlines. In her deposition Birch admitted she had some "pretty late" PFDs, but could not remember how many.

Nor could she remember being dishonest with Rusch in January regarding the state of her docket. Birch admitted her conditions – ADD, depression, and anxiety – resulted in disorganized thinking, suggesting this caused her failure to remember in January the true state of her docket.

After this meeting, Rusch undertook an investigation into Birch's docket. The investigation resulted in a memorandum to General Counsel Sullivan dated March 10, 2009. In the memorandum, Rusch advised Sullivan that Birch had initially denied problems with her docket, but ultimately admitted to several late PFDs, and had requested an accommodation based on a doctor's diagnosis. Rusch said she uncovered several problematic cases. Within these cases, Rusch claimed to have discovered inconsistencies and irregularities within Birch's documentation and recordkeeping. More specifically, Rusch found records were inappropriately kept open, late PFDs, and a failure to issue orders according to the SOAH policy.

On March 13, 2009, at a meeting with the Chief ALJ and others, Birch was terminated. In the written notice of termination, it stated Birch was terminated for "[r]epeated misreporting of PFD due dates." The summary of facts in the notice stated that as a result of her March 3, 2009 meeting with Rusch, the SOAH evaluated Birch's current docket and "discovered a pattern of misstatements pertaining to the record–closed dates reported in your PFDs and in your internal reporting." The notice stated she also failed to apprise her team leader of impending deadlines that would not be met; Birch denied knowing this was a SOAH policy. The notice went on to state Birch had artificially extended her record–closed dates, and thereby artificially extended the due dates for her PFDs. As a result of Birch's misstatements, the SOAH management lost faith in the accuracy of her reporting, making her continued employment "untenable." Birch was permitted to resign in lieu of termination.

Thereafter, Birch filed suit against the SOAH, alleging: (1) gender, age, and disability discrimination, and (2) retaliation for seeking an accommodation and for speaking out regarding

the alleged disparate treatment at the SOAH of older, female ALJs. In response, the SOAH filed a plea to the jurisdiction, claiming with regard to Birch's discrimination claims that she was not terminated because of her age, gender, or disability. Rather, according to the SOAH, Birch was terminated for a pattern of false statement to supervisors, and fabricating dates with regard to her caseload, i.e. artificially extending record–closed dates and resulting due dates for PFDs. The SOAH argues Birch cannot show others who were non–protected and similarly situated were treated more favorably, an element of a discrimination claim under section 21.051. *See McCoy*, 183 S.W.3d at 554; TEX. LAB. CODE ANN. § 21.051. Based on the evidence set forth above, which was included in the SOAH's plea to the jurisdiction, we find the SOAH provided evidence to establish Birch was fired for non–discriminatory reasons. Accordingly, the burden shifted to Birch to present more than a scintilla of evidence that she was terminated based on her age, gender, or disability. *See Miranda*, 133 S.W.3d at 228.

With regard to Birch's retaliation claims, the SOAH again asserts it established, as a matter of law, Birch was fired for non–discriminatory reasons. The SOAH contends Birch cannot establish (1) she was engaging in a protected activity, or (2) that her engagement in such activity was the cause for her termination. *See* TEX. LAB. CODE ANN. § 21.051. As noted in the preceding paragraph, the SOAH provided proof of non–discriminatory reasons for termination. Thus, the burden on the retaliation claims shifted to Birch to present more than a scintilla of evidence that she engaged in a protected activity, and engagement in this activity resulted in her termination.

As noted throughout this opinion, a person claiming discrimination under the TCHRA must show, among other things, that non–protected employees were not treated similarly. *McCoy*, 183 S.W.3d 554. With regard to her age and gender discrimination claims, Birch presented much the same circumstantial evidence presented by Wood (affidavit of Smith, deposition testimony of

Homer and Wood), as well as her own testimony. However, Birch relied upon different comparators.

As we stated in our review of Wood's discrimination claims, comparators may be used as circumstantial evidence. *See Cherry*, 438 Fed. Appx. at 351. However, an employee who relies upon fellow employees to show she was treated differently than others similarly situated, must demonstrate the employment actions were taken "under nearly identical circumstances," which requires, among other things, that the fellow employees relied upon have essentially comparable violation histories. *Lee*, 574 F.3d at 260. And, as we noted, it is critical that the plaintiff's conduct that drew the adverse employment action be "nearly identical to that of the proffered comparator who allegedly drew" a dissimilar response. *Id.* As stated by the Fifth Circuit, "[i]f the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer,' the employees are not similarly situated." *Id.* (quoting *Wallace*, 271 F.3d at 221–22).

Much of Birch's testimony related to age and gender discrimination was based on disparity in pay. It seems Birch relied upon two other ALJ IIIs, Penny Wilkov and Paul Keeper, as her comparators. According to Birch, Wilkov and Keeper were paid more than she was paid even though they started at the SOAH at approximately the same time. According to Birch, Wilkov was younger than she, and of course, Keeper was male. When asked if she had received pay raises, Birch testified that she had, but others like Wilkov and Keeper got "more and better" raises. Even with her increases, she was still behind her peers. According to Birch, an open records request proved the disparity in pay between Birch and these younger and/or male ALJ IIIs.

Birch also testified that when she started at the SOAH, she discovered that Paul Keeper was permitted to work outside the confines of the agency as an arbitrator, which allowed him to

earn extra income. According to Birch, when she asked the former Chief ALJ Sheila Taylor if she could continue with some work she had outside the agency, she was told she could not.

Accepting as true Birch's statements regarding disparity in pay, there is no evidence these comparators had essentially comparable violation histories as the history that resulted in Birch's termination. True, there is evidence that at least Keeper had untimely PFDs – we can find no such evidence as to Wilkov. However, Birch presented no evidence that any conduct by Wilkov and Keeper was "nearly identical" to that for which she was terminated. *See Lee*, 574 F.3d at 260. There is no evidence Keeper or Wilkov engaged in serial misrepresentation of record–closed dates or PFD due dates, the actual basis for Birch's termination as stated in the notice of termination. In addition, there is no evidence Keeper or Wilkov failed to advise their supervisors of potential missed due dates or failed to issue orders in accordance with SOAH policy. We hold the conduct for which Birch was terminated differed from those she claimed were treated differently due to age and gender. *See Hockman*, 282 F. Supp. 2d at 557–58. Accordingly, Birch's comparator evidence does not constitute even a scintilla of evidence that she was treated differently from those who were similarly situated.

However, like Wood, Birch presented more than evidence of comparators. Birch presented the same circumstantial from Katherine Smith and Homer that was presented by Wood. In addition, she presented Wood's testimony. We have already determined this evidence, when taken as true and indulging all reasonable inferences therefrom, constitutes more than a scintilla of evidence of disparate treatment based on age and gender. Again, we note the evidence is but slight, but this is all that is required at this stage of the proceedings. Accordingly, we hold the trial court did not err in denying the SOAH's plea to the jurisdiction with regard to Birch's age and gender claims under section 21.015 of the TCHRA.

With regard to her disability claim, however, we hold there is not even a scintilla of evidence of disparate treatment based on her asserted disabilities. There is nothing more than Birch's bare allegation. We therefore hold the trial court erred in denying the SOAH's plea to the jurisdiction with regard to Birch's disability claim under section 21.051.

With regard to her retaliation claims – termination based on retaliation for engaging in protected activities – the SOAH contends there is no evidence Birch engaged in protected activities or that engaging in any protected activity resulted in Birch's termination. We hold that like Wood, Birch engaged in protected activities. First, there is evidence that Birch complained about disparity in pay to the former Chief ALJ, and to a team supervisor. Second, she complained about the SOAH's failure to promote Katherine Smith, an older, female ALJ. Birch complained about this to the former Chief ALJ and to Chief ALJ Parsley, who at the time of the complaint was general counsel for the SOAH. She also complained about the failure to promote Cathy Egan and to promote in a timely manner Wood. Like Wood, Birch testified her actions caused her to become known as a "dissenter."

Complaining about discriminatory behavior and reporting it to the general counsel and the Chief ALJ constitutes protected activity. *See Lopez*, 259 S.W.3d at 150. However, engaging in the activity is insufficient to state a prima facie case for retaliation under section 21.055. There must be more than a scintilla of evidence that the protected activity formed, at least in part, the basis for the employer's adverse employment action. *See McCoy*, 183 S.W.3d at 554; *see* TEX. LAB. CODE ANN. § 21.055; *see also Johnson*, 203 S.W.3d at 11.

The only evidence in the record as to whether the SOAH's decision to terminate Birch was based on her decision to engage in a protected activity, i.e., complaining about disparate treatment of older, female ALJs, is Birch's testimony. Again, subjective beliefs alone are insufficient. *See Chandler*, 376 S.W.3d at 814; *McCoy*, 183 S.W.3d at 554.

However, with regard to her claim that she was terminated because she engaged in the protected activity of seeking an accommodation for a disability, we hold there is more than a scintilla of evidence the request for an accommodation resulted, at least in part, in her termination. It is undisputed Birch sought an accommodation for her disabilities, and seeking an accommodation is a protected activity. *See Hagood v. County of El Paso*, No. 08–11–00280–CV, 2013 WL 2250613, at *9 (Tex. App.—El Paso May 22, 2013, no pet.); *see also E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 n.9 (5th Cir. 2009) (holding request for accommodation is protected activity for purposes of retaliation claim under Americans With Disabilities Act). Moreover, the evidence is undisputed that a mere ten days after Birch requested an accommodation, she was terminated. Authorities have recognized that when determining whether an employee has presented some evidence she was fired for engaging in a protected activity, courts consider the temporal proximity between the participation in the activity and the employer's adverse action. *Hagood*, 2013 WL 2250613, at *9; *Johnson*, 203 S.W.3d at 11. In *Johnson*, the court specifically held that "[c]lose timing between an employee's protected activity and the adverse action can provide the causal connection required for a *prima facie* case" under section 21.055, the retaliation portion of the TCHRA. 203 S.W.3d at 11 (emphasis in original); *see also Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). The Supreme Court has held that for "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" to establish a prima facie case of causality in a retaliation claim, the temporal proximity must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001). Periods of three months, four months, and twenty months have been deemed insufficient without other evidence. *Id.* (citations omitted). The Tenth Circuit has held one and a half months between the protected activity and the adverse action is sufficient to show causation.

*Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 588 (10th Cir. 1994), *overruled on other grounds by Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1194–97 (10th Cir. 1998).

Here, Birch only had to produce more than a scintilla of evidence, and we hold ten days is "very close" for purposes of causality in a retaliation claim. Accordingly, we hold the trial court did not err in denying the SOAH's plea as to Birch's retaliation claim based on her request for an accommodation.

## CONCLUSION

Based on the foregoing, we hold the trial court did not err in denying the SOAH's plea to the jurisdiction as to Wood's and Birch's claims of age and gender discrimination. Wood and Birch produced more than a scintilla of evidence to establish, with regard to their prima facie case, they were terminated for discriminatory reasons. We also hold the trial court did not err in denying the SOAH's plea to the jurisdiction as to Birch's retaliation claim based on the protected activity of seeking an accommodation. The close temporal proximity between the accommodation request and her termination is more than a scintilla of evidence of the required causal connection. However, we further hold the trial court erred in denying the SOAH's pleas to the jurisdiction as to: (1) all of Landeros's claims because Landeros failed to provide more than a scintilla of evidence of constructive discharge after the SOAH established she resigned; (2) all of Homer's claims because as a matter of law Homer did not suffer an adverse employment action—he retired; (3) Wood's retaliation claim because Wood failed to provide more than a scintilla of evidence she was terminated for engaging in a protected activity (complaining about disparate treatment of protected class) after the SOAH established she was terminated for non–discriminatory reasons; (4) Birch's claim of discrimination based on disability because Birch did not produce more than a scintilla of evidence she was terminated because of her disability after the SOAH proved she was terminated for other, non–discriminatory reasons; (5) Birch's retaliation claim based on protected activity

(complaining about disparate treatment of protected class) after the SOAH established she was terminated for non–discriminatory reasons.  Accordingly, we affirm the trial court's judgment in part, and reverse and render judgment in part.  We render judgment dismissing all of the claims brought by Landeros and Homer, the retaliation claim brought by Wood, the disability claim brought by Birch, and the retaliation claim brought by Birch based on the protected activity of speaking out against disparate treatment.

Marialyn Barnard, Justice